IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2006

## STATE OF TENNESSEE v. TONY SAMUEL

**Appeal from the Circuit Court for Lauderdale County**
**No. 7691    Joe H. Walker, Judge**

---

**No. W2006-00090-CCA-R3-CD  - Filed July 12, 2007**

---

The defendant was indicted for one count of aggravated rape and one count of aggravated kidnapping of his live-in girlfriend's fourteen-year-old, mentally-challenged daughter.  A jury convicted the defendant of both indicted offenses.  The trial court sentenced the defendant to thirty-five years for the aggravated rape and eighteen years for the aggravated kidnapping to be served concurrently to each other, but consecutively to a previous sentence.  On appeal, the defendant argues: (1) that the evidence was insufficient to sustain his convictions of aggravated rape and aggravated robbery; (2) that the trial court erred in allowing questions to jurors in voir dire regarding mental retardation; (3) that the trial court erred in allowing testimony regarding the victim's I.Q. test scores and capabilities; (4) that the trial court erred in allowing testimony by a State witness regarding statements of the victim; (5) that the trial court erred in allowing testimony from a lay witness regarding recency and appearance of the injury to the victim; (6) that the trial court erred in determining that the victim was competent to testify; and (7) that the trial court erred in sentencing the defendant to an enhanced and consecutive sentence.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Kari I. Weber, Assistant Public Defender, Somerville, Tennessee, for the appellant Tony Samuel

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; Elizabeth Rice, District Attorney General; and Tracey Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant lived in a house with April Powell and her son, D.P., and daughter, C.P.[1] He had lived in the house with April Powell and her children for around eight or nine years. Both C.P.'s room and the room shared by Ms. Powell and the defendant were on the front of the house and faced the street. Around 7:30 a.m., on June 8, 2004, April Powell drove Linda Buck and her daughter to summer school. D.P. was not at home because he had spent the night at a friend's house. After Ms. Powell left, the defendant came into C.P.'s room and pulled off C.P.'s pants. He then had vaginal intercourse with C.P. while he was choking her. C.P. stated that the intercourse hurt. At some point afterwards, she took a shower and wiped off with a towel. C.P. was fourteen years old at the time of the incident.

When Ms. Powell and Ms. Buck returned to the house around 7:40 a.m., C.P. ran out with her pants unzipped, crying and screaming that the defendant had raped her. C.P. repeated the accusations seven or eight times. The defendant said that C.P. was lying.

Everyone went into the house, and Ms. Powell told C.P. to change her clothes. Ms. Powell took no action regarding C.P.'s accusations. Denise Estes came to get Ms. Buck to take her for an interview. They took C.P. with them to get her away from the house. Ms. Buck and Ms. Estes returned C.P. to her home after Ms. Buck's interview.. Ms. Buck called her sister, Brenda Allen, who subsequently reported the incident to the police between 11:00 a.m. and 12:00 p.m. the same day. Ms. Buck and Ms. Allen came back to the house later that day, and Sergeant Rita Burnett was at the house.

When Sergeant Burnett arrived at the victim's home, the victim was across the street playing with another child. The victim, who knew Sergeant Burnett by name, asked the officer if she was looking for her. C.P. started crying and told Sergeant Burnett, "[The defendant] choked me, and he put his thing in my pie-pie, and he was hunching on me." C.P. also told the sergeant that the defendant came into her room while she was in bed, ripped the covers off her bed, and pulled her clothes down. The defendant told her that C.P. should not tell anyone and that he would kill her. C.P. also said it felt like the defendant urinated on her. Sergeant Burnett noticed that C.P. had a bruise-like mark as if someone had dug a fingernail into C.P.'s neck. After C.P. told Sergeant Burnett what happened, Sergeant Burnett began collecting evidence. She collected C.P.'s underwear, a white wash towel, a towel used by the defendant, and a pair of capri pants. Sergeant Burnett did not take the sheets on the bed because they were in the washing machine. She also did not collect the gown that C.P. was wearing during the incident because she could not find it. Throughout the time that Sergeant Burnett was with C.P. at her house, the sergeant did not see the victim's mother or the defendant. Juvenile Officer Dawn Hemby did come to the house when Sergeant Burnett was conducting her investigation.

---

[1]As is Court policy, we will refer to the minor victim and her brother by their initials.

Sergeant Burnett took C.P. to the hospital. April Smith of the Tennessee Department of Children's Services was at the hospital when C.P. arrived. There were no parents with C.P. when she arrived at the hospital. C.P. arrived at the hospital around 1:30 p.m., but was not seen until around 5:00 p.m. Ms. Smith remained with the victim throughout her wait and during the examination. She was informed the that C.P. was mentally-challenged. Sherry Fitzpatrick was the nurse who assisted in C.P.'s examination and the assembling of the rape kit. The victim was very anxious and frightened during the examination. The medical personnel were unable to get the victim undressed and into a hospital gown. C.P. refused to have a pelvic exam, but internal vaginal swabs were taken during the examination. There was no sign of external injury. C.P.'s mother had arrived by the end of the examination.

Following the examination, Ms. Smith drew up a child protective services safety plan where C.P. would stay with her aunt and not have any contact with the defendant. In addition, C.P.'s contact with her mother was to be supervised by her aunt.

After the rape kit was assembled at the hospital, it was given to Sergeant Burnett. Sergeant Burnett gave the rape kit and other bagged evidence to Officer Marilyn Johnson with the Ripley Police Department. Officer Johnson took the evidence to the Tennessee Bureau of Investigation ("TBI") laboratory on June 9, 2004, which was within twenty-four hours of its collection. The bags were all sealed when she received them and when she left them at the laboratory.

After the day in question, the defendant repeatedly called the victim's home, where he had resided with the victim's mother. When D.P., the victim's brother, answered the telephone, he told the defendant to stop calling and hung up on the defendant. At one point, the victim's cousin, Cornelia Capers, was visiting Ms. Powell at her home. The phone rang repeatedly and Ms. Capers asked Ms. Powell if she was going to answer the phone. Ms. Capers opined that it was probably the defendant, and they could find out where he was. The phone continued to ring and Ms. Capers answered the phone. In order to trick the defendant into returning home and turning himself into the police, Ms. Capers told the defendant that C.P. had lied. Ms. Capers in fact believed C.P., but she wanted the defendant to return.

On the day of the rape, Sergeant Burnett attempted to locate the defendant. She also collected witness statements. Included in the statements were several telephone numbers from a caller identification record from the defendant's calls to the victim's house. The numbers were from an area code in Missouri, where the defendant had family. On June 10, 2004, Sergeant Burnett faxed a warrant for the defendant to the authorities in Missouri. That same day, the defendant turned himself in to the Ripley Police Department. He gave a statement to the police that he went into C.P.'s room to look out of the window and that C.P. jumped up screaming that he had raped her. The defendant also submitted voluntarily to have his blood drawn. Sergeant Burnett sent this sample to the laboratory at the TBI.

Special Agent Kadria Debnam is a serology DNA analyst with the TBI. She received evidence, including the rape kit and other evidence collected from the victim. On June 9, 2004

Special Agent Debnam analyzed the evidence for a DNA match with the defendant. She was able to find semen on the vaginal swabs included in the rape kit. However, there was not enough of a sample to test for DNA. Special Agent Debnam also analyzed the victim's underwear. There was an insufficient amount of the sperm fraction to conduct DNA analysis. However, there was a sufficient amount of the non-sperm fraction to conduct DNA analysis. Special Agent Debnam testified that she found the defendant's DNA in the sample she collected from the victim's underwear.

School psychologist Susan Conner testified at the trial. She stated that an I.Q. of 70 and below is considered mentally retarded. Ms. Conner reviewed C.P.'s files and discovered that C.P.'s I.Q. was 44. This score equates to an age-level of six or seven years old. Biologically, at the time of the trial, the victim was fifteen, but intellectually she was six or seven. Ms. Conner's experience is that children with this range of I.Q. are generally honest. Ms. Conner had not interacted with C.P. for about eight years and did not know C.P. or her family personally.

On October 4, 2004, the Grand Jury of Lauderdale County indicted the defendant for one count of aggravated rape and one count of aggravated kidnapping. At the conclusion of the trial held on September 20 and 21, 2005, a jury found the defendant guilty of both counts as charged. The trial court held a sentencing hearing on October 5, 2005. The trial court sentenced the defendant to eighteen years for the aggravated kidnapping and thirty-five years for the aggravated rape to be served concurrently and at one hundred percent as a violent offender. The trial court also ordered the defendant's sentences to run consecutively to a sentence from a separate conviction. On December 9, 2005, the trial court denied the defendant's motion for new trial. The defendant filed a timely notice of appeal.

## ANALYSIS

The defendant argues seven issues in his appeal: (1) whether the trial court erred in allowing questions to jurors in voir dire regarding mental retardation; (2) whether the trial court erred in allowing testimony regarding the victim's education records; (3) whether the trial court erred in allowing testimony by a State witness regarding statements of the victim; (4) whether the trial court erred in finding the victim competent to testify; (5) whether the trial court erred in allowing testimony from a lay witness regarding recency and appearance of the injury to the victim; (6) whether the evidence is sufficient to sustain his convictions for aggravated rape and aggravated robbery; and (7) whether the trial court improperly sentenced the defendant to an enhanced and consecutive sentence.

## Voir Dire Questions

The defendant's first issue is that the trial court erred during voir dire of the jury when it allowed the State to question jurors regarding their knowledge of mental retardation and at trial when it allowed a witness to testify regarding the victim's I.Q. and developmental level. The defendant argues that this was improper because the State did not indict the defendant for aggravated rape

-4-

under 39-13-502(3)(B) which requires, "The defendant is aided and abetted by one (1) or more other persons; and . . . (B) the defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." The State argues that the questions concerning and the proof of C.P.'s mental retardation were submitted to explain the victim's potential child-like behavior during her testimony.

"The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial." *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994). The conducting of the voir dire of prospective jurors is in the discretion of the trial court. *Id.* Therefore, an appeal from a trial court's decision cannot be overturned by this Court unless it is apparent that the trial court abused its discretion. *See State v. Mickens*, 123 S.W.2d 335, 375 (Tenn. Crim. App. 2003).

The defendant objected to the State's questioning regarding the jurors' knowledge of mental retardation. In response to this objection, the State replied that "the voir dire is to determine if these jurors can be fair and impartial, and the State has a right to know if they would be against or not be fair and impartial to a mentally retarded child that's going to testify." The trial court overruled the defendant's objection.

C.P. was going to be called as a witness. At the time of the trial, she was fourteen and had an I.Q. of 44, which put her at the same functioning level as a six- or seven-year-old child. The State had a definite interest in determining whether any jurors would have a bias against believing the victim because of her mental retardation. We do not see any abuse of discretion here.

Testimony Regarding C.P.'s Mental Retardation

The defendant also argues that the trial court erred in allowing Susan Conner to testify regarding C.P.'s test scores and mental capabilities. As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. *See, e.g.*, *Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

The defendant objected to Ms. Conner's testimony at the time she was called to the witness stand. The defendant's basis for the objection was that the State charged the defendant with aggravated rape based upon bodily injury under T.C.A. § 29-13-502(a)(2), as opposed to a

perpetrator being aided and abetted by another and the victim is mentally defective or incapacitated, under T.C.A. § 39-13-502(a)(3)(B). For this reason, the defendant did not believe that this information had "any bearing on the case-in-chief." The defendant also argued that this testimony would be more appropriate for sentencing. The trial court overruled the defendant's objection stating, "I think the jury has a right to know the mental capacity for lots of reasons, including testing the credibility of the witness."

In *State v. Caughron*, 855 S.W.2d 526 (Tenn. 1993), our supreme court allowed third party testimony regarding the State's primary witness to a murder. In *Caughron*, the key witness to a murder was a fourteen-year-old girl. The trial court allowed the girl's mother to testify that the girl was "having trouble in school and crying a lot." *Caughron*, 855 S.W.2d at 538-39. Our supreme court stated, "We find no error, although the relevance of this evidence is marginal. Testimony about April's emotional reaction to the murder tends to bolster her credibility, as does testimony about her continued contact with the Defendant." *Id.* at 539.

The situation *sub judice* is analogous. Ms. Conner testified about the victim's mental retardation and I.Q. so as to allow the jury to accurately assess C.P.'s credibility when she testified. We agree with the trial court that this testimony was at least marginally useful in the jury's assessment of the victim's credibility, and find no error in its admission.

For these reasons, this issue is without merit.

## Linda Buck's Testimony

The defendant argues that the trial court erred in allowing Ms. Buck to testify that C.P. ran to the car while screaming and crying that the defendant raped her. The defendant objected "to anything that [C.P.] said." The trial court overruled the defendant's objection without comment. The defendant argues that the trial court erred in not noting for the record which hearsay exception applied.

While it might be helpful on appeal, this Court can find no legal requirement that a trial court place its reasoning for overruling a hearsay objection on the record. We now turn to the question as to whether C.P.'s statement fits into a hearsay exception. A statement is hearsay if "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). For a hearsay statement to be admissible, it must fall within the hearsay exceptions provided at Rule 803 of the Tennessee Rules of Evidence.

One of the long-recognized exceptions to the hearsay rule is the excited utterance exception found at Rule 803(2) of the Tennessee Rules of Evidence. This exception applies to statements, "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000), this Court stated that the "underlying theory of this exception is that circumstances may produce a

-6-

condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." For a statement to fall within this exception, three criteria must be met: (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement. *Id.* at 528-29 (citing Neil P. Cohen, et. al., Tennessee Law of Evidence § 803(2).2 at 533-34 (3d ed. 1995)).

It is clear that C.P.'s statement falls within the excited utterance exception found at Rule 803(2) of the Tennessee Rules of Evidence. As for the first criteria, the defendant coming into the victim's room, pulling her pants down, and vaginally penetrating her would certainly be a startling event. This is especially true when one considers the fact that C.P. is fourteen with an I.Q. of 44, which puts her at the intellectual equivalent of a six- or seven-year-old child. As for the second criteria, C.P.'s statement that the defendant had raped her, this unquestionably relates to the startling event. The third criteria is also satisfied. Ms. Buck testified that C.P.'s mother could not have been gone more than ten or fifteen minutes. The rape occurred in the short time span while C.P.'s mother was gone. Clearly, C.P. would still have been under emotional and even physical stress from the rape.

Because the statement in question fits within the excited utterance exception to the hearsay rule, this issue is without merit.

### Victim's Competency to Testify

The defendant argues that the trial court erred when it determined that C.P. was competent to testify. The defendant specifically argues that the trial court's evaluation of C.P.'s competency was not sufficiently thorough. The State argues that this issue is waived and, in the alternative, that C.P. was competent to testify.

The State points out that the defendant failed to enter a contemporaneous objection to C.P.'s testimony at trial. Typically, a defendant's failure to make a contemporaneous objection during trial constitutes a waiver of this issue. Tenn. R. Evid. 1023(a)(1); Tenn. R. App. P. 36(a) (stating that "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Cravens*, 764 S.W.2d 754, 757 (Tenn. 1989). Nonetheless, we choose to address this issue on the merits.

Rule 601 of the Tennessee Rules of Evidence states that every person is presumed competent to be a witness. The Advisory Commission Comments go on to say that, "[v]irtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons." Under Rule 602, a prospective witness may testify as long as they have personal knowledge of the matter in question and under Rule 603, the witness must swear to testify truthfully. It is in the trial court's discretion to determine whether the witness is competent to testify. *Caughron*, 85 S.W.2d at 538. This Court cannot overturn a trial court's decision absent an abuse of discretion. *State v. Howard*,

926 S.W.2d 579, 584 (Tenn. Crim. App. 1996), *overruled on other grounds*, *State v. Williams*, 977 S.W.2d 101 (Tenn. 1998).

The trial court conducted a voir dire examination of C.P. outside the presence of the jury. At this examination, the State asked if the victim knew the difference between a lie and telling the truth. She replied that she did. The State then demonstrated that C.P. knew the difference between a lie and the truth through giving an example of someone's hair color. The trial court re-emphasized that the victim was to tell the truth when the jury was returned to the courtroom.

We find no abuse of discretion by the trial court. As stated above, all witnesses are presumed to be competent. The State and the trial court questioned C.P. outside the presence of the jury during which time the victim demonstrated that she knew the difference between a lie and the truth. The trial court determined that the victim was competent to testify. This Court finds ample support for the trial court's decision, and finds no error here.

### Officer's Testimony Regarding Bruise on Victim's Neck

The defendant argues that the trial court erred in allowing Sergeant Burnett to testify regarding the bruise on C.P.'s neck. Sergeant Burnett testified concerning the injury on the victim's neck at two separate points in her direct examination. The first occasion, the State asked if she had seen any injury on C.P. Sergeant Burnett replied, "She had a mark. It wasn't like a – it was kind of like a bruise but like, you know, how you dig your nail in." The defendant did not object to this testimony. On the second occasion, the following exchange occurred:

> Q.     When you assisted the victim in this case, is there any doubt in your mind that you saw the visible signs of injury to her neck?
>
> A.     There's no doubt.
>
> Q.     Could you tell if that injury had been made recently or it was an old mark from days gone by?
>
> A.     It was a recent –
> [The defendant's attorney]: Your Honor, I'd object. I don't believe that Sergeant Burnett is a medical professional and would be able to make that assessment.
>
> The Court: If you will restate your question, please.
>
> Q.     Sergeant Burnett, are you a mother?
>
> A.     Yes, I am.

Q.      And during your experience of having children, have you been able to see when they've had recent injuries about their persons?

A.      Yes, ma'am.

Q.      And as an individual that has seen this type of thing before, could you recognize whether this was a recent injury or an old injury about her neck?

A.      Yes, I could.

Q.      And what was that?

A.      Recent.

Q.      No further questions.

[The Court]:    The Court will allow that question and answer.

[The State]:    Pass the witness.


The defendant specifically argues on appeal that this testimony by Sergeant Burnett was improper medical proof of "bodily injury" offered through a lay witness. The State argues that the defendant did not object to the witness's testimony following the State's laying of the foundation, and, therefore, this issue is waived. In the alternative, the State argues that Sergeant Burnett's testimony was proper as opinion testimony under Rule 701 of the Tennessee Rules of Evidence.

This Court concludes that the defendant's ultimate objection to Sergeant Burnett's testimony is sufficient to reserve this issue for review. We now turn to the issue at hand. "It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to review for abuse of discretion." *Caughron*, 855 S.W.2d at 540. Rule 701 of the Tennessee Rules of Evidence states:


(a) Generally. – If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
(1) rationally based on the perception of the witness and
(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

In *State v. Boggs*, 932 S.W.2d 467 (Tenn. Crim. App. 1996), this Court allowed a vehicular homicide victim's daughter to testify about her mother's physical disabilities in the defendant's sentencing hearing. 932 S.W.2d at 473-74. *Boggs* analyzed the version of Rule 701 that was in effect prior to the 1996 amendment of the rule. *Id.* at 474; *see e.g.* Tenn. R. Evid. 701(a). This prior version of Rule 701(a) was more restrictive than the current Rule 701(a), which mirrors Federal Rule of Evidence 701. Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 7.01[3] (Matthew Bender & Co. 2005); *See also* Fed. R. Evid. 701. In *Boggs*, this Court stated, "[T]he admissibility of a lay witness' testimony rests on whether the facts in issue are within the range of knowledge or understanding of ordinary laymen. Likewise, expert testimony is only necessary when the average person would not be knowledgeable on the subject matter at issue." (citations omitted) (citing J. Houston Gordon, The Admissibility of Lay and Expert Opinions, 57 Tenn. L. Rev. 103 (1989)). This Court's statement leads to the conclusion that a lay witness may testify to matters that are in the common experience of most individuals.

There is also a line of cases in Tennessee common law that hold:

> The rule in this State is that a lay witness may testify to his own physical condition or that of another person provided that the witness first states the detailed facts and then gives his opinion or conclusion. *Norton v. Moore*, 40 Tenn. 480; *Stephens v. Clayton*, 22 Tenn. App. 449, 124 S.W.2d 33; *Hamlin & Allman Iron Works v. Jones*, 200 Tenn. 242, 292 S.W.2d 27.

*Simpson v. Satterfield*, 564 S.W.2d 953, 955-56 (Tenn. 1978) (quoting *McKenzie v. Campbell and Dann Manufacturing Co.*, 209 Tenn. 475, 354 S.W.2d 440 (1962)). This line of cases supports the current prevalent procedure of requiring witnesses to lay a factual foundation before testifying concerning their opinion.

In the case at hand, Sergeant Burnett initially testified that she saw a mark on the victim's neck that looked like someone had dug his fingernail into the victim's skin. The defendant objected to the second instance when Sergeant Burnett stated that the mark looked like it was a recent mark. The State then laid the factual foundation to support Sergeant Burnett's testimony by establishing that she was a mother and had seen several injuries on her own children and was able to discern if they were recent or not.

We conclude that the age of a mark where a fingernail has dug in an individual's skin is within the common knowledge of the general public, especially a mother. If an opinion is based upon a lay witness's own observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible. *State v. Wingard*, 891 S.W.2d 628, 636 (Tenn. Crim. App. 1994) *overruled on other grounds by State v. James*, 81 S.W.3d 75 (Tenn. 2002). We also find that this testimony was both "rationally based on the perception of the witness "and helpful to a clear understanding of . . . the determination of a fact in issue." *See* Tenn. R. Evid.

701(a).  Sergeant Burnett's testimony was important to establishing whether the victim suffered bodily injury during the rape.

For these reasons, we conclude that the trial court did not abuse its discretion in allowing Sergeant Burnett's testimony into evidence.

### Sufficiency of the Evidence

The defendant also argues that the evidence is insufficient to support his convictions for aggravated rape and aggravated kidnapping.[2]  When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994);  *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75.  In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914.  As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779.  Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

### Aggravated Rape

Aggravated rape, under the defendant's indictment, is defined as, "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by the following circumstances: . . . (2) The defendant caused bodily injury."  T.C.A. § 39-13-502(a)(2).  Sexual penetration is defined as, "sexual intercourse, . . . or any other intrusion, however slight, of any part

---

[2]Neither party raises the issue as to whether the defendant's convictions for both aggravated rape and aggravated kidnapping violate his due process rights as set out in *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991).  In this particular case, the defendant's sentence for aggravated rape is longer than his sentence for aggravated kidnapping, and the sentences were ordered to be served concurrently. Even if there is an *Anthony* issue, setting aside the aggravated kidnapping conviction would not change the defendant's sentence.  Therefore, we find no substantial right of the defendant so effected as to warrant plain error review. *See, State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000).

of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required . . . ." T.C.A. § 39-13-501(7). Bodily injury "includes a cut, abrasion, *bruise*, burn or disfigurement, and *physical pain* or temporary illness . . . ." T.C.A. § 39-11-106(a)(2) (emphasis added).

The defendant argues that the evidence is insufficient because the victim's testimony regarding the rape was "too vague" to prove penetration. The defendant also points to the lack of medical and forensic evidence of the rape. The defendant further argues that bodily injury was not proven through the testimony of the medical personnel, and Sergeant Burnett's testimony of a bruise was not sufficient to prove injury.

The victim testified that the defendant came into her room and pulled off her pants. At trial, the State brought out that the victim called a penis "a thing" and a vagina "a hole." She testified that the defendant touched her on her body and the defendant stuck his thing in the hole, in reference to herself. Nurse Fitzpatrick testified that the victim was very frightened at the hospital and would not allow a pelvic exam, but did allow medical personnel to take vaginal swabs. The rape kit with the vaginal swabs and other evidence, including the victim's underwear, were sent to Special Agent Debnam. Special Agent Debnam determined that the vaginal swabs did contain semen, however, there was not enough to test. She was, however, able to match the defendant's DNA with semen sample taken from the victim's underwear. Sergeant Burnett's testimony established that C.P. suffered a bruise during the rape. Moreover, C.P. testified that the intercourse caused her pain and that the defendant choked her during the rape.

The evidence is sufficient to support the aggravated rape conviction.

Aggravated Kidnapping

Aggravated kidnapping is defined as, "false imprisonment, as defined in § 39-13-302, committed: (1) To facilitate the commission of any felony or flight thereafter . . . ." T.C.A. § 39-13-304(a)(1). False imprisonment occurs when an individual, "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

The victim testified that the defendant entered her bedroom and had intercourse with her. She stated that while he was in her bedroom he choked her. Certainly a fair inference is that C.P. was not free to leave her room at this time. The victim's testimony also supports the conclusion that the defendant was confining the victim as required by T.C.A. § 39-13-302(a) to commit aggravated rape. As we stated above, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779.

Because we find that a rational trier of fact could find the defendant guilty of every element of aggravated rape and aggravated kidnapping, we conclude that the evidence is sufficient to support the defendant's convictions for both crimes. Therefore, this issue is without merit.

Sentencing

The defendant's final issue is that the trial court erred in sentencing him to thirty-five years at 100% for aggravated rape and eighteen years at 100% for aggravated kidnapping, to be served concurrently to each other and consecutively to a previous sentence of seven years at thirty-five percent.[3] "When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. T.C.A. §§ 40-35-103(5), -210(b); *Ashby*, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

The trial court made the following findings at the sentencing hearing:

I've reviewed the presentence report and find that the defendant should be sentenced as a multiple offender, having a minimum of two prior felony convictions within the next two lower felony classes.

I've considered the principles of sentencing, the nature and characteristics of the criminal conduct involved.

I find, under T.C.A. 40-31-114, that enhancing factor number one applies; that is, the defendant has a previous history of criminal convictions or criminal behavior in addition to what was necessary to establish the appropriate range. The victim in this matter had a slight mental disability. I give that little weight, but not much weight. *And that the defendant was on bond or bail at the time of the commission of this offense.*

The Court finds, under T.C.A. 40-35-113, that the defendant did not cause serious bodily injury by his actions.

---

[3]The Appellant does not raise the issue of the application of enhancing factors under the United States Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004) and in *Cunningham v. California*, 549 U.S. __, 127 S.Ct. 856 (2007) with regard to the trial court's application of the enhancement factors. Therefore, this issue is waived. Because the defendant has not put forth an argument relying on the factors warranting plain error review, we decline to address this issue.

-13-

The Court finds enhancing factors greatly outweigh the mitigating factors, and sentences the defendant in Count 1 to 35 years as a multiple offender, to serve, under T.C.A. § 40-35-501, a hundred percent of the sentence; and in Count 2 sentences the defendant as a multiple offender to 18 years, to serve a hundred percent under T.C.A. 40-35-501.

The defendant is on community supervision for life under T.C.A. 39-13-524. He is subject to the STSO Act under T.C.A. 39-13-701, and the SORM Act under T.C.A. 40-39-101.

The Court finds that the defendant was released on bond in Docket Number 7690, where he was charged with a felony offense with an offense date of May 27, 2004. These acts were committed June 8, 2004, and that under Rule 32 the defendant is required to be sentenced to consecutive sentencing, and under T.C.A. 40-20-111 it requires consecutive mandatory sentencing. The Count 1 and Count 2 will be run concurrently but consecutive to Docket Number 7690.

Is there anything else we need to address?

[Defendant's counsel]: Your Honor, I was unaware of anything in the record that Mr. Samuel was on bond. . . .

[The Court]: All right. I'll ask the clerk to get Docket Number 7690 to make a determination, so I can make a determination.

In addition to which, in case that's correct, the Court finds that the defendant is a professional criminal who has devoted a good portion of his life to criminal acts; that he has a record of criminal activity that's extensive, having been convicted of multiple offenses including delivery of cocaine, theft, aggravated burglary, forgery, burglary, and other convictions; that he's a dangerous offender whose behavior in Docket Number 7690 indicates little or no regard for life and has no hesitation about committing a crime; and that the Court believes that consecutive sentencing is the appropriate sentence in this matter, and runs the sentence in 7690 consecutive to the other – I'm sorry – 7691 consecutive to 7690, whether he was on bond at the time or not.

The Court finds that – the Court specifically finds that the sentence to run consecutive is congruent with the principles of sentencing and necessary for the protection of society; that the defendant has been tried before on various forms of release status without success, and that he has a long history of criminal convictions and criminal behavior; that consecutive sentencing between 7690 and 7691 is reasonably related to the severity of the offenses committed, that it serves to protect the public or society from further criminal acts from this defendant who has resorted

-14-

to aggravated criminal conduct, and it's congruent with the general principles of sentencing.

And to correct my initial statement on the record, I believe, reviewing the file which I now have in front of me in 7690, that counsel was probably correct, or is correct, that the criminal offense occurring on May 27, 2004, I do not see a bond in the file indicating that the defendant was on release status at the time of the commission of the acts in 7691, and I'll correct that on the judgment form also by the deletion of that language on the judgment form.

But even if not mandatory consecutive, the Court feels consecutive sentencing is appropriate in this case. Okay.

(Emphasis added).

The trial court sentenced the defendant as a Range II Multiple Offender. To qualify as a Range II, Multiple Offender, a defendant must have received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes . . . ." Aggravated rape is a Class A felony. T.C.A. § 39-13-502(b). Aggravated kidnapping is a Class B felony. T.C.A. § 39-13-304(b)(1). The defendant's presentence report contains two Class C felonies and two Class D felonies, which would qualify him as a Range II Multiple Offender. In 1991, the defendant was convicted for aggravated burglary, a Class C felony. T.C.A. § 39-14-403(b). In 1993, the defendant was convicted of delivery of a schedule II drug less than .5 grams, also a Class C felony. T.C.A. § 39-17-417(b)(1). In 1998, the defendant was convicted for burglary-other than habitation, which is a Class D felony. In May of 2004, before the current offense occurred, the defendant committed both burglary-other than a habitation, a Class D felony, and theft of property $500-$1000, a Class E felony.

The defendant argues that the trial court erred in not specifically stating the convictions that it was relying upon to sentence the defendant as a Range II Multiple Offender. However, the defendant stipulated to the presentence report and, therefore, is bound by its contents. Because the presentence report supports the decision of the trial court with regard to his sentencing range, we find no error in the trial court's failure to set out the specific convictions in the record.

Consecutive Sentence

The defendant also argues that the trial court erred in ordering the defendant to serve his current sentences consecutively to a sentence from a previous conviction.[4] The trial court originally ordered consecutive sentences because of the mistaken belief that the defendant was on bond at the time he committed the current offense. However, after realizing the mistake, the trial court set out additional reasons to support consecutive sentencing. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in T.C.A. § 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood; (2) [t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(1), (2).

The defendant's presentence report begins with a conviction for aggravated burglary when the defendant was twenty-three years old. From that time forward, he was convicted for theft eight times, delivery of a schedule II drug once, forgery three times, burglary other than a habitation twice and other various traffic violations. On the date of the final offenses included in the report, the defendant was thirty-six years old. The few gaps in time between offenses roughly correlate with the defendant's incarceration for those convictions. In addition, the majority of the crimes listed above all deal with the defendant obtaining money. The presentence report includes a listing of various construction jobs, as well as temporary positions, which were of short duration and from which he resigned. These convictions support the trial court's findings that the defendant is a professional criminal and used these criminal acts as a major source of his livelihood, as well as the fact that the defendant has an extensive criminal record. We conclude that the defendant's record meets the criteria for consecutive sentencing set out in T.C.A. § 40-35-115(b)(1) and (2).

We find that the sentence imposed by the trial court is supported by the record. Therefore, this issue is without merit.

---

[4]We note that the United States Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *Cunningham v. California,* 549 U.S. __, 127 S.Ct. 856 (2007), which has called into question our supreme court's decision in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), do not affect our review of consecutive sentencing issues. Before our supreme court's decision in *Gomez*, it had specifically noted that *Blakely* did not impact our consecutive sentencing scheme. *State v. Robinson*, 146 S.W.3d 469, 499 n. 14 (Tenn. 2004). In addition, this Court has consistently found that *Blakely* does not affect consecutive sentencing determinations. *See State v. Rose Marie Hernandez*, No. M2003-01756-CCA-R3-CD, 2004 WL 2984844, at *4 (Tenn.Crim.App., Nashville, Dec. 16, 2004); *State v. Earice Roberts*, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *15 (Tenn. Crim. App., Jackson, Nov. 23, 2004); *State v. Lawrence Warren Pierce*, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at *16 (Tenn. Crim. App., Nashville, Nov. 9, 2004).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE