IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2009

**TONY SAMUEL v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Lauderdale County**
**No.  7691     Joseph H. Walker, III, Judge**

**No.  W2008-02346-CCA-R3-PC  - Filed November 16, 2009**

A Lauderdale County jury found the petitioner guilty of aggravated rape and aggravated kidnapping. The trial court sentenced the petitioner to an effective thirty-five year sentence in the Tennessee Department of Correction.  The petitioner appealed his convictions to this court, which affirmed the convictions and sentence.  The petitioner then sought post-conviction relief on the theory that he received ineffective assistance of counsel during the trial, *inter alia*.  The post-conviction court dismissed the petition.  The petitioner now appeals.  Following our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Rebecca S. Mills, Ripley, Tennessee, for the appellant, Tony Samuel.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Tyler Burchyett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Procedural Background

In 2004, a Lauderdale County Grand Jury indicted the petitioner on one count of aggravated rape and one count of aggravated kidnapping.  The public defender's office represented the petitioner in general sessions court, where he waived his preliminary hearing.  In October, 2004, the public defender's office assigned counsel to represent the petitioner at trial.  Following the September 2005 trial, a jury found the petitioner guilty on both counts.  The trial court sentenced the petitioner to thirty-five years on the aggravated rape count, to be served consecutively to a sentence from a previous burglary conviction, and eighteen years on the aggravated kidnapping conviction, to be served concurrently with the thirty-five year sentence.

The petitioner appealed his convictions, arguing insufficiency of the evidence and various trial court errors. This court affirmed the convictions. The following is a summary of the facts of the case taken from this court's opinion on direct appeal:

The [petitioner] lived in a house with April Powell and her son, D.P., and daughter, C.P.[1] He had lived in the house with April Powell and her children for around eight or nine years. Both C.P.'s room and the room shared by Ms. Powell and the [petitioner] were on the front of the house and faced the street. Around 7:30 a.m., on June 8, 2004, April Powell drove Linda Buck and her daughter to summer school. D.P. was not at home because he had spent the night at a friend's house. After Ms. Powell left, the [petitioner] came into C.P.'s room and pulled off C.P.'s pants. He then had vaginal intercourse with C.P. while he was choking her. C.P. stated that the intercourse hurt. At some point afterwards, she took a shower and wiped off with a towel. C.P. was fourteen years old at the time of the incident.

When Ms. Powell and Ms. Buck returned to the house around 7:40 a.m., C.P. ran out with her pants unzipped, crying and screaming that the [petitioner] had raped her. C.P. repeated the accusations seven or eight times. The [petitioner] said that C.P. was lying.

Everyone went into the house, and Ms. Powell told C.P. to change her clothes. Ms. Powell took no action regarding C.P.'s accusations. Denise Estes came to get Ms. Buck to take her for an interview. They took C.P. with them to get her away from the house. Ms. Buck and Ms. Estes returned C.P. to her home after Ms. Buck's interview. Ms. Buck called her sister, Brenda Allen, who subsequently reported the incident to the police between 11:00 a.m. and 12:00 p.m. the same day. Ms. Buck and Ms. Allen came back to the house later that day, and Sergeant Rita Burnett was at the house.

When Sergeant Burnett arrived at the victim's home, the victim was across the street playing with another child. The victim, who knew Sergeant Burnett by name, asked the officer if she was looking for her. C.P. started crying and told Sergeant Burnett, "[The [petitioner]] choked me, and he put his thing in my pie-pie, and he was hunching on me." C.P. also told the sergeant that the [petitioner] came into her room while she was in bed, ripped the covers off her bed, and pulled her clothes down. The [petitioner] told her that C.P. should not tell anyone and that he would kill her. C.P. also said it felt like the [petitioner] urinated on her. Sergeant Burnett noticed that C.P. had a bruise-like mark as if someone had dug a fingernail into C.P.'s neck. After C.P. told Sergeant Burnett what happened, Sergeant Burnett began collecting evidence. She collected C.P.'s underwear, a white wash towel, a towel used by the [petitioner], and a pair of capri pants. Sergeant Burnett did not take the sheets on the bed because they were in the washing machine. She also did not collect the gown

---

[1] As is court policy, we will refer to the minor victim and her brother by their initials.

that C.P. was wearing during the incident because she could not find it. Throughout the time that Sergeant Burnett was with C.P. at her house, the sergeant did not see the victim's mother or the [petitioner]. Juvenile Officer Dawn Hemby did come to the house when Sergeant Burnett was conducting her investigation.

Sergeant Burnett took C.P. to the hospital. April Smith of the Tennessee Department of Children's Services was at the hospital when C.P. arrived. There were no parents with C.P. when she arrived at the hospital. C.P. arrived at the hospital around 1:30 p.m., but was not seen until around 5:00 p.m. Ms. Smith remained with the victim throughout her wait and during the examination. She was informed the that C.P. was mentally-challenged. Sherry Fitzpatrick was the nurse who assisted in C.P.'s examination and the assembling of the rape kit. The victim was very anxious and frightened during the examination. The medical personnel were unable to get the victim undressed and into a hospital gown. C.P. refused to have a pelvic exam, but internal vaginal swabs were taken during the examination. There was no sign of external injury. C.P.'s mother had arrived by the end of the examination.

Following the examination, Ms. Smith drew up a child protective services safety plan where C.P. would stay with her aunt and not have any contact with the [petitioner]. In addition, C.P.'s contact with her mother was to be supervised by her aunt.

After the rape kit was assembled at the hospital, it was given to Sergeant Burnett. Sergeant Burnett gave the rape kit and other bagged evidence to Officer Marilyn Johnson with the Ripley Police Department. Officer Johnson took the evidence to the Tennessee Bureau of Investigation ("TBI") laboratory on June 9, 2004, which was within twenty-four hours of its collection. The bags were all sealed when she received them and when she left them at the laboratory.

After the day in question, the [petitioner] repeatedly called the victim's home, where he had resided with the victim's mother. When D.P., the victim's brother, answered the telephone, he told the [petitioner] to stop calling and hung up on the [petitioner]. At one point, the victim's cousin, Cornelia Capers, was visiting Ms. Powell at her home. The phone rang repeatedly and Ms. Capers asked Ms. Powell if she was going to answer the phone. Ms. Capers opined that it was probably the [petitioner], and they could find out where he was. The phone continued to ring and Ms. Capers answered the phone. In order to trick the [petitioner] into returning home and turning himself into the police, Ms. Capers told the [petitioner] that C.P. had lied. Ms. Capers in fact believed C.P., but she wanted the [petitioner] to return.

On the day of the rape, Sergeant Burnett attempted to locate the [petitioner]. She also collected witness statements. Included in the statements were several telephone numbers from a caller identification record from the [petitioner]'s calls to the victim's house. The numbers were from an area code in Missouri, where the [petitioner] had family. On June 10, 2004, Sergeant Burnett faxed a warrant for the

[petitioner] to the authorities in Missouri. That same day, the [petitioner] turned himself in to the Ripley Police Department. He gave a statement to the police that he went into C.P.'s room to look out of the window and that C.P. jumped up screaming that he had raped her. The [petitioner] also submitted voluntarily to have his blood drawn. Sergeant Burnett sent this sample to the laboratory at the TBI.

Special Agent Kadria Debnam is a serology DNA analyst with the TBI. She received evidence, including the rape kit and other evidence collected from the victim. On June 9, 2004 Special Agent Debnam analyzed the evidence for a DNA match with the [petitioner]. She was able to find semen on the vaginal swabs included in the rape kit. However, there was not enough of a sample to test for DNA. Special Agent Debnam also analyzed the victim's underwear. There was an insufficient amount of the sperm fraction to conduct DNA analysis. However, there was a sufficient amount of the non-sperm fraction to conduct DNA analysis. Special Agent Debnam testified that she found the [petitioner]'s DNA in the sample she collected from the victim's underwear.

School psychologist Susan Conner testified at the trial. She stated that an I.Q. of 70 and below is considered mentally retarded. Ms. Conner reviewed C.P.'s files and discovered that C.P.'s I.Q. was 44. This score equates to an age-level of six or seven years old. Biologically, at the time of the trial, the victim was fifteen, but intellectually she was six or seven. Ms. Conner's experience is that children with this range of I.Q. are generally honest. Ms. Conner had not interacted with C.P. for about eight years and did not know C.P. or her family personally.

*State v. Samuel*, 243 S.W.3d 592, 596-98 (Tenn. Crim. App., at Jackson, July 12, 2007) *perm. app. denied* (Tenn. Oct. 15, 2007). The petitioner timely filed a *pro se* petition for post-conviction relief, arguing that the trial court did not have subject matter jurisdiction. After the trial court appointed counsel, post-conviction counsel filed an amended petition further arguing that the petitioner received ineffective assistance of counsel. The post-conviction court held an evidentiary hearing on September 26, 2008.

The petitioner called trial counsel, who testified that she has been a licensed attorney in Tennessee for eight years, currently and at time of trial employed by the public defender's office. Counsel stated that she did not represent the petitioner at his preliminary hearing, but another attorney from the public defender's office represented him. She testified that the office originally assigned someone else to the petitioner's case but assigned her to both this case and the previous burglary case before trial. Counsel stated that it was "not unusual" to reassign cases. She testified that she met with the petitioner ten times, approximately thirty to forty-five minutes each time, and once for two hours just before trial. She further testified that they spoke about both cases until after the trial in the burglary case. They met approximately eight times solely about the rape case. Counsel testified that she gave the petitioner copies of all the discovery material she had received as of December 21, 2004. She said that she reviewed all of the witness statements with the petitioner, although she could not recall giving him copies of those statements. She recalled discussing the possible testimony of April Powell and that April Powell refused to speak with her

before trial. Furthermore, counsel testified that she believed April Powell's testimony would be damaging to the petitioner, that other witnesses would testify that April Powell left the residence for only five minutes, and that the state had subpoenaed April Powell. Counsel stated that she could not remember the petitioner specifically asking her to call April Powell as a defense witness. Counsel did not remember the petitioner discussing the criminal histories of other witnesses with her, but she stated that she would have had an investigator research each witness's background. Counsel also could not remember whether she "vigorously cross-examined [the witnesses] to the satisfaction of [the petitioner]." She testified that if she had been able to impeach the witnesses with their criminal histories, she would have done so. Counsel recalled that the petitioner asked her to introduce a prior allegation by the victim against the petitioner, but she testified that she believed such evidence would be harmful to the petitioner and chose not to bring it up at trial. Counsel testified that she cross-examined the treating nurse about evidence of sexual penetration because the lack of such evidence was one of the defense's theories. Counsel said that she did not present photographic evidence that the petitioner did not have any scratches on his person on the day of the alleged rape, but she did question the responding police officer about the lack of scratches and brought it out in closing arguments. Counsel testified that she did not remember if she asked the victim about scratching the petitioner. Counsel testified that she "continually tried to emphasize" that the state's DNA evidence was weak. She recalled discussing with the petitioner how the state had matched his DNA to the semen found. Counsel testified that she had hired an expert to assist her in understanding the DNA evidence and the state's laboratory process. The expert, according to counsel, did not find any flaws in the state's evidence and would not have supported the petitioner's case if called to testify at trial. Counsel testified that she did not ask the expert to analyze the samples because he indicated that they would not get a different result. Furthermore, counsel said that she did not ask the expert to give her written documentation so that she would not have to give that documentation to the state on reciprocal discovery. Counsel testified that she discussed at every meeting with the petitioner the severity of the sentence he could expect if the jury found him guilty. Counsel said that the petitioner believed that the state's evidence was not enough to convict him. Counsel testified that she did not question the petitioner's level of intelligence because he wrote clear, understandable letters to her and communicated with her effectively. Counsel said that she discussed various defense theories with the petitioner, including chain of command issues and evidence gathering issues. Counsel testified that the state had offered the petitioner twelve years. She said that they discussed the advantages and disadvantages of the petitioner testifying at trial, and he chose not to testify.

The petitioner testified that he did not realize that he had waived the preliminary hearing and that counsel did not represent him at the preliminary hearing. The petitioner said that the public defender's office had assigned counsel to his case after he requested a different attorney than the one they had originally assigned. He testified that he did not "feel like [he] had adequate time" to meet with counsel and that most discussion with counsel centered on his other case. The petitioner testified that he did not remember receiving any discovery on December 21, but he did receive the laboratory sheet. He said he did not receive the witness statements until November 15, and he presented an envelope to the court as evidence that he received discovery, including witness statements, on November 15. The post-conviction court admitted the envelope as Exhibit One. The petitioner testified that he did not have time to review the witness statements before trial. The petitioner said that he asked his attorney to call April Powell as a witness to testify that she was only gone from the home for five minutes. He further stated that while Ms. Powell did not testify to that

-5-

fact, another witness did. The petitioner said that he asked counsel to raise the previous "unfounded" allegation by the victim. He testified that, instead of presenting that allegation, counsel filed a motion in limine to exclude that statement. The petitioner testified that his counsel did not cross-examine other witnesses to his satisfaction. He stated that he had been in special education classes when he lived in Missouri and that he sometimes had trouble understanding things. The petitioner testified that counsel advised him to take the state's ten year offer, but he thought that the state's proof would not be enough to convict him. He did not understand how he could be convicted if the state did not have proof of sexual penetration. He testified that his attorney used that theory at trial but "[i]t didn't mean anything evidently."

The petitioner further testified that he submitted a motion challenging the jurisdiction of the trial court. He stated, "I'm protected by the Constitution. I'm not bound to follow the rules and regulations of a commission or committee and I find these books that they used against me or statute book, Tennessee Code Annotated and Tennessee Jury Pattern Instruction, don't even show the authority behind the act. It's not showing that it's coming from legislation." The petitioner testified that his indictment was invalid because "there is no valid law of legislation on the indictment . . . which causes lack of subject matter jurisdiction of this Court."

At the close of proof, the post-conviction court took the matter under advisement. The court issued an order denying post-conviction relief, finding that the petitioner did not prove by clear and convincing evidence that he received ineffective assistance of counsel. The court found that the petitioner did not show "that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases." The court also found that the petitioner did not prove that he was prejudiced by his attorney's representation. The post-conviction court dismissed the petitioner's remaining arguments, including the lack of subject matter jurisdiction, as being improper for a post-conviction action. The petitioner has appealed.

**Analysis**

On appeal, the petitioner argues the single issue of ineffective assistance of counsel.[2] Specifically, the petitioner argues that trial counsel was deficient because she failed to give the petitioner copies of witness statements prior to trial, to interview various witnesses, to sufficiently cross-examine witnesses, to introduce a false allegation that the victim previously made, and to take into account the petitioner's background in special education. Upon review of the record and the parties' briefs, we conclude that the petitioner failed to demonstrate that trial counsel provided ineffective assistance.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. §

---

[2] In his petition, the petitioner argued a number of grounds that he has abandoned on appeal. Since our review generally does not extend to issues not presented for review, we decline to address arguments in support of the petitioner's claim for post-conviction relief pursued below but not presented to this court for review. *See* Tenn. R. App. P. 13(b).

40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Id.*

To establish ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State,* 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id.* (citations omitted).

First, the petitioner argues that counsel was deficient because she did not send him copies of witness statements prior to trial. The post-conviction court accredited counsel's testimony that she gave the petitioner all the discovery she had available prior to trial. Additionally, she said that she went over the witness statements with the petitioner despite not sending copies of the statements until after the trial. We conclude that the petitioner failed to show any deficiency. The petitioner is not entitled to relief on this claim.

Secondly, the petitioner argues that counsel should have interviewed the victim, the victim's mother, and the investigating officer prior to trial; should have called the victim's mother to the stand; and should have cross-examined the state's witnesses about their criminal backgrounds. The record indicates that counsel attempted to interview the witnesses, but they refused to speak with her. Counsel testified at the post-conviction hearing that she believed calling the victim's mother to the stand would have been detrimental to the petitioner's case. Furthermore, another witness testified to the same facts about which the petitioner wanted the victim's mother to testify. Counsel also testified that she would have used any witness's prior history to impeach them if there had been anything useful for impeachment. The petitioner did not meet his burden to present the witnesses at the post-conviction hearing that he claimed his attorney should have interviewed, presented, or impeached. Generally, the presentation of these witnesses at the post-conviction hearing is necessary to prove that counsel's failure to utilize these witnesses resulted in prejudice to the petitioner. *See*

-7-

*Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither the post-conviction court nor this court may speculate on what a witness's testimony might have been if introduced by counsel. *Id.* Accordingly, the issue is without merit.

The petitioner also argues that counsel did not consider his special education background when explaining the issues of the case, particularly the DNA evidence. At the post-conviction hearing, counsel testified that she did not inquire into his education background or intellectual capability because the petitioner wrote clear letters and was able to effectively communicate. The record indicates that counsel spent considerable time explaining the DNA evidence to the petitioner. Furthermore, she discussed the seriousness of the sentence the petitioner could expect if the jury found him guilty at every meeting with him, but he refused an offer from the state because "he didn't think that the DNA evidence was going to be strong enough." We conclude that the petitioner has failed to show that counsel was deficient or that any prejudice resulted from a deficiency.

**Conclusion**

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
J.C. McLIN, JUDGE