# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 25, 2011 Session

## STATE OF TENNESSEE v. SCOTT D. JULIAN

**Appeal from the Criminal Court for Knox County**
**No. 89711     Richard R. Baumgartner, Judge**

---

**No. E2010-00735-CCA-R3-CD - Filed June 28, 2011**

---

The Defendant, Scott D. Julian, was convicted by a Knox County Criminal Court jury of three counts of sexual battery by an authority figure, a Class C felony, and sexual exploitation of a minor, a Class D felony. See T.C.A. §§ 39-13-527, 39-17-1003 (2010). He was sentenced as a Range I, standard offender to three years' probation for each of the sexual battery convictions and to two years' confinement for the sexual exploitation conviction, to be served concurrently. On appeal, he contends that (1) the evidence was insufficient to support his convictions, (2) the State's failure to provide a more specific bill of particulars deprived him of a fair trial and the ability to prepare a defense, (3) the trial court erred by denying his request to question witnesses about the existence of a sexual relationship between the victim and a witness, (4) the trial court erred by admitting a recorded telephone conversation between the Defendant and the victim, and (5) the State's election of the offenses in counts three and five were not specific enough to ensure jury unanimity. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

William C. Talman, Knoxville, Tennessee, for the appellant, Scott D. Julian.

Robert E. Cooper, Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall Nichols, District Attorney General; and Steven Sword and Charme Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case relates to events occurring at the Defendant's and the victim's former place of employment. At the trial, the victim testified that she was eighteen years old at the time of the trial. She said she previously worked as a cashier at Mangia Pizza and More from August 2007 until May 2008. She said that the Defendant was her supervisor at the restaurant and that he hired her. She said she knew the Defendant before she began working at the restaurant because she was a frequent customer there. She said that she normally worked on Tuesdays and Saturdays from 5:00 p.m. until the restaurant closed and that she occasionally worked late with the Defendant and other employees.

The victim testified that the Defendant made her feel uncomfortable when he began making sexual comments about her body and telling her of his sexual dreams about her. She said that she did not respond to the comments and that she "laughed them off" until the Defendant began "harassing" her physically. She said that the Defendant frequently "smacked" her buttocks and touched her between her legs and on her vagina but that she did not remember specific dates when the Defendant touched her. She said the Defendant touched her buttocks in the women's restroom, when she cleaned underneath tables in the dining room, and when she walked to the drink area. She said the Defendant touched her vagina over her clothes while she was behind the pizza station. She said she and the Defendant also "french" kissed. She said that the Defendant told her "not to move" when he touched her and that she did not tell anyone about the touching because she did not know what to do.

The victim testified that the touching continued and that she performed oral sex on the Defendant "a few times." She said that the oral sex began after her seventeenth birthday and that she also touched the Defendant's penis with her hands. She said the Defendant would "suggest" that she touch his penis and place his hands over her hand when she touched him to "help him masturbate." She said she told the Defendant that she did not want to touch his penis and that they should not do it because it was "not right." She said that the last time she performed oral sex on the Defendant was in the office during her last shift on May 6, 2008, and that the Defendant asked her to perform oral sex on him and take a photograph. She did not remember the dates when she previously performed oral sex on the Defendant but said it was "pretty recent."

The victim testified that the Defendant also asked her to pose for nude photographs. She said the Defendant used his cell phone to take photographs of her breasts and of her performing oral sex on him. She said that the Defendant took the photographs in his office and that she lifted her shirt for a photograph. She said that she was able to glance at the photographs of her on his phone when he showed them to her quickly but that she was not

-2-

able to see the photographs well.  She said that Brad Dehler, a co-worker, also saw the photographs but that she never spoke with Mr. Dehler about the Defendant.

The victim testified that the Defendant never used physical force against her but that she "felt obligated" to engage in the sexual acts because the Defendant was her boss.  She said that as a result of the Defendant's actions, she had trouble sleeping, experienced "flashbacks," and had difficulty being around older men.  She said that she told her mother about the Defendant and that she spoke with the police.  She said she made a "party consent call" to the Defendant while he was at work, which the police recorded.  The call was played for the jury.  In the call, the Defendant repeatedly denied the victim's allegations, stated that he had no idea what the victim was talking about, questioned whether she was confusing his actions with those of Mr. Dehler or Tyler Rouse, and told her they needed to speak about her allegations in person.

The victim testified that she made the call at the request of the police and that the purpose of the call was to have the Defendant admit what he had done to her.  She said that it was unusual for her to call the Defendant and that she was nervous during the call.  She said she lied during the call when she told the Defendant she had feelings for him.  She said she never previously indicated to the Defendant that she had feelings for him.  She said she testified truthfully about the sexual contact.

On cross-examination, the victim testified that Larry Webb was the restaurant's owner, not her supervisor.  She said that the Defendant hired her, but that she spoke with Mr. Webb before she was hired.  She said that she met with Mr. Webb briefly for an employee evaluation but that she never told Mr. Webb the Defendant harassed her.  She said Mr. Webb only came to the restaurant once every two or three weeks and stayed for thirty minutes.  She agreed that she typically worked on Tuesdays and Saturdays from 5:00 until 7:00 p.m. and that other people were usually present while she worked.  She said most of the sexual conduct occurred when the restaurant was closing and no one was present.  She agreed that someone always worked with her and the Defendant and that she never worked with the Defendant alone.  She said she normally worked with Mr. Dehler and Mr. Rouse.  She said she never told any of her coworkers, other than Mr. Dehler, that the Defendant harassed her.  She said she told Mr. Dehler that the Defendant made her feel uncomfortable.

The victim testified that a couple of weeks after she began working at the restaurant in August 2007, the Defendant told her about dreams he had involving her.  She said that sexual activity with the Defendant began shortly after her seventeenth birthday on October 30, 2007, and that it continued until she quit her job.  She did not know the date when the Defendant first touched her.  She said the Defendant asked her to allow him to take a photograph while she performed oral sex on him during her last day of work on May 6, 2008.

-3-

She said she did not remember any other specific dates when sexual activity occurred. She agreed the Defendant grabbed her buttocks and rubbed her legs but said she did not remember when it occurred. She said the Defendant "harassed" her. She agreed she did not want to have sexual contact with the Defendant but said the Defendant "persuaded" her. She said the Defendant did not force her.

The victim identified several photographs of the restaurant and explained where sexual activity occurred. She identified a photograph of the restrooms and said the Defendant kissed her and touched her in the women's restroom, but she did not remember the date it happened. She identified a photograph of the pizza station and said the Defendant touched her between her legs behind the pizza station, but she did not remember the date it happened or how many times he touched her behind the pizza station. She said that other employees were in the store at the time but that they did not see the Defendant touch her. She identified a photograph of the back freezer, said the Defendant also touched her while they were in the freezer, but did not remember the date it happened. She identified a photograph of the drink station, said the Defendant grabbed her buttocks there, but did not remember the date it happened. She identified a photograph of the office and said she performed oral sex on the Defendant in the office and allowed him to take photographs of her there. She said that she performed oral sex on the Defendant more than once and that one instance occurred on May 6, 2008. She said that Mr. Dehler also worked on May 6 and that he washed dishes while she was in the office with the Defendant. She identified a photograph of the dining room, said the Defendant smacked her buttocks there on more than five occasions, but did not remember the dates it happened.

The victim agreed that the Defendant was opening the store when she called him and that she never previously told the Defendant she had feelings for him. She said that the officer recording the telephone call prompted her to tell the Defendant she had feelings for him. She said she had not filed a lawsuit against the restaurant alleging sexual harassment and seeking money but did not know if anything had been filed on her behalf.

On redirect examination, the victim testified that although she did not remember specific events when the Defendant touched her at the restaurant, she remembered his actions. She said that the Defendant touched her more than once while she worked and that she did not enjoy it. She said she told Mr. Dehler she felt uncomfortable around the Defendant and mentioned "the grasping and the comments."

On recross-examination, the victim testified that she remembered what she received for Christmas the previous year and that the Defendant did not give her anything for Christmas. She said that she did not buy Christmas or Valentine's Day gifts for the Defendant and that he did not give her any gifts. She said that she attended a Christmas party

with the Defendant and other restaurant employees but that nothing inappropriate happened at the party.

In response to questions from the jury, the victim testified that she never saw the Defendant outside the workplace, other than at the Christmas party. She said she stopped working at the restaurant due to the Defendant's behavior. She said the Defendant never indicated that she would be given a raise or be fired if she did not comply with his requests. She said that the Defendant did not threaten her to stay quiet about their relationship but that he told her no one would believe her if she said anything. She said she kept a journal. She said that "something" occurred each time she worked after the initial touching and that she allowed the Defendant's conduct to continue because she did not know what to do.

On redirect examination, the victim testified that she was scheduled to work on the day she called the Defendant but that she did not go to work. She said she did not write anything about the Defendant in her journal because she did not start keeping a journal until after she left the restaurant.

On recross-examination, the victim testified that all of the sexual incidents occurred at the restaurant. She said she did not tell anyone at the restaurant because she was not close to anyone there. She agreed she did not tell her parents about the Defendant until May 2008. She said sexual comments or touching occurred each time she worked with the Defendant after the initial touching.

On redirect examination, the victim testified that although all of the sexual incidents happened at work, the Defendant asked her to go to the gym where he worked out and give him oral sex. She said the Defendant never asked her to go to his home.

On recross-examination, the victim testified that the Defendant normally worked out with Mr. Dehler and Rob Morrow. She said she never went to the gym with them. She did not remember the date when the Defendant asked her to go to the gym.

Brad Dehler testified that he worked at Mangia Pizza and More from March 2007 until May 2008. He said that he worked with the victim at the restaurant and that the Defendant was their manager. He said that he and the Defendant were friends and that they worked out together while he was employed at the restaurant. He said that the victim was not well liked at the restaurant and that he did not get along with the victim because she had a "bad attitude." He said he, the victim, and the Defendant were alone in the restaurant on Tuesday nights.

Mr. Dehler testified that the Defendant made sexual comments about the victim almost every time they worked together. He said that the Defendant would tell the victim she had "a nice butt, nice boobs" and that the Defendant asked him if he thought the victim was attractive and whether Mr. Dehler would have sex with her. He said that the Defendant asked him if he wanted to have a threesome with the Defendant and the victim and that the Defendant asked the victim more than once to perform oral sex on the Defendant. He said that one night while he worked out with the Defendant, the Defendant called the victim and asked her to come to the gym and perform oral sex. He said the victim did not go to the gym.

Mr. Dehler testified that he saw the Defendant hug the victim, kiss her neck, and grab her buttocks and that it occurred almost every Tuesday they worked together. He said the victim did not react to the Defendant when he touched her. He said that he saw the Defendant put his hand down the front of the victim's pants while they stood near the dishwashing area and that he saw the Defendant and the victim walk out of the office two or three times. He said that the Defendant closed the office door when he went there with the victim but that the Defendant never closed the door when Mr. Dehler was there with him. He said the Defendant showed him photographs on the Defendant's cell phone of the victim. He said that one photograph showed the victim lifting her shirt to expose her bra and that another photograph appeared to be the victim performing oral sex on the Defendant. He said he saw the photograph of oral sex in late April or early May 2008.

Mr. Dehler testified that he called the Defendant on May 10, 2008, to ask if he wanted Mr. Dehler to bring him food on his way into work. He said the Defendant declined the offer but called back twenty minutes later, told Mr. Dehler that the victim called the police, and instructed Mr. Dehler not to tell the police anything and not to speak with the victim. He said investigators came to the restaurant later that day and spoke with the Defendant but not with him. He said that he spoke with the Defendant later that evening and that the Defendant told him he deleted the photographs from his cell phone and asked Mr. Dehler to take the blame and tell the police that he took the photographs of the victim as a joke. He said the Defendant was upset and cried. He said that he spoke with Investigator Tonkin a few days later and that he told her he did not know anything because he did not want the Defendant to get into trouble. He said he eventually "broke down and just started telling" because the investigator knew he was lying. He said that he had no contact with the Defendant after May 10 and that the only contact he had with the victim was when she sent him a text message informing him that a court date had been rescheduled.

On cross-examination, Mr. Dehler testified that the Defendant hired him and was his boss but that Mr. Webb interviewed him. He said Mr. Webb came to the restaurant "every now and then" but not daily. He said he discussed raises with Mr. Webb but not employee evaluations. He said he did not discuss the victim's allegations with Mr. Webb. He agreed

he worked out with the Defendant while he was employed at the restaurant. He agreed he did not get along well with the victim. He said that he never spoke with the victim on the telephone and that they did not exchange text messages, other than the one regarding a court date. He said he did not discuss the case or the Defendant's actions with the victim. He said that he did not spend time with the victim outside of work and that they were not involved in any way. He said he and the victim never dated or went anywhere together. Mr. Dehler agreed that he, the Defendant, and the victim worked together on Tuesdays from 5:00 p.m. until the restaurant closed. He said the victim stopped working at the restaurant in May 2008. He agreed he did not tell anyone about what he saw the Defendant do with the victim. He said the Defendant called the victim and requested that she come to the gym and perform oral sex toward the end of April 2008.

Mr. Dehler testified that the Defendant showed him two photographs on the Defendant's cell phone of the victim. He said that the first photograph showed the victim lifting her shirt to expose her bra and that the second showed her performing oral sex on the Defendant, although he was not "a hundred percent clear if it was her" in the second photograph. He said he did not see the photographs being taken.

In response to questions from the jury, Mr. Dehler testified that the Defendant showed him a photograph of the victim about ten to fifteen minutes after coming out of the office. He said the victim's face was not covered in the photograph depicting oral sex. He said he considered the victim to be his coworker, not his friend. He said he decided to quit his job at the restaurant because he did not feel it was a safe place to work. He said the victim never indicated that she was interested in the Defendant. He said he never dated the victim.

On further cross-examination, Mr. Dehler testified that the Defendant showed him the oral sex photograph sometime during the last two weeks of April 2008. He agreed he was not sure if the woman in the photograph was the victim and said, "I just kind of put two and two together . . . they came out of a locked office, and then a few minutes later I see that picture." He agreed the Defendant was placed on paid administrative leave after the victim spoke with the police. He said he quit his job because the Defendant's actions caused him to feel unsafe at the restaurant. He said he was walking between the cash register and the dishwashing area when he saw the Defendant and the victim walk out of the locked office around 7:30 or 8:00 p.m. at the end of April.

On redirect examination, Mr. Dehler testified that he saw the Defendant and the victim leave the office together on three occasions, the last of which was at the end of April 2008. In response to a question from the jury, Mr. Dehler testified that no customers were in the restaurant when he saw the Defendant and the victim leave the office.

Knoxville Police Investigator Phyllis Tonkin testified that she worked with the family crimes unit and that she received specialized training involving investigation of child abuse. She said that on May 9, 2008, she received a telephone call informing her that the victim's attorney had called the police and reported the Defendant's actions. She said she interviewed the victim and arranged for the victim to come to the police station on May 10, 2008, to make a one-party consent call to the Defendant. She said the purpose of the call was to have the victim speak with the Defendant about the alleged crime. She said that the call was made about 10:30 a.m. and that the victim was very nervous. She said she went to the restaurant around 8:15 p.m. and spoke with the Defendant. She said the Defendant appeared to be nervous because his legs shook and he chewed multiple pieces of gum. She said the Defendant denied the victim's allegations. She said the Defendant stated that although he did not know why the victim would accuse him, the victim may have done it because "if [she's] not happy, nobody's going to be happy." She said the Defendant never said the victim was "out to get him." She said she confiscated the Defendant's cell phone and computer but did not find any photographs of the victim. She said she interviewed Mr. Dehler four days later at Farragut High School. She said Mr. Dehler did not initially implicate the Defendant but eventually changed his story after she asked him how he would feel if something similar ever happened to his daughter.

On cross-examination, Investigator Tonkin testified that the victim's attorney initiated contact with the police and was present when the victim called the Defendant from the Knoxville Police Department. She said Assistant District Attorney Steven Sword was also present during the call. She said she decided not to seize the Defendant's cell phone and computer until after the call. She said she did not tell the victim what to say during the call. She said that she suggested the victim find a way to discuss her allegations against the Defendant but that the victim decided to say she had feelings for the Defendant. She agreed an objective of the call was to have the Defendant make an admission.

Investigator Tonkin testified that she was not able to interview the Defendant until later that night because she went to the Defendant's home to take photographs and had to prepare a search warrant to seize the Defendant's cell phone and computer. She said she obtained the warrant after speaking with the Defendant. She said she subpoenaed the Defendant's cell phone records but was unable to obtain the deleted photographs or anything that was sent from the Defendant's phone. She agreed she recorded the conversation she had with the Defendant. The thirty-seven minute recording was played for the jury. In the recording, the Defendant told Investigator Tonkin about the telephone call he received earlier in the day from the victim, denied the victim's allegations, and allowed Investigator Tonkin to search his cell phone. The Defendant said the manager of Marble Slab Creamery, the victim's previous place of employment, warned him to watch the victim because the victim stole money from the ice cream shop. He said employees informed him that the victim used

pills and smoked marijuana and that the victim was kicked out of high school after rumors arose suggesting the victim was involved with "threesomes." He said the victim told stories at work of her marijuana and alcohol use and of numerous persons with whom she had sex. He said that Mr. Dehler had sex with the victim and that Mr. Rouse kissed the victim.

In response to questions from the jury, Investigator Tonkin testified that she did not find any photographs of the victim on the Defendant's cell phone or computer. She said the Defendant was not aware that the interview was recorded. She said that she suggested potential topics for the victim to use during the telephone call to the Defendant but that the victim decided which topic to discuss. She said that Mr. Dehler was seventeen years old when she interviewed him and that she had his mother's permission to conduct the interview at his school.

The victim's mother testified that the victim changed high schools. She said the victim transferred because the first school was overcrowded and had "lots of drugs" and fights. She said her concerns were not with the victim's behavior at school but with the school environment. She said she had no reason to believe the victim used drugs or was engaged in sexual activity. She said that the new school was interested in the victim's joining their competitive cheerleading squad and that the victim passed a random drug test administered by the school.

Larry Webb testified for the defense that he owned Mangia Pizza and More and that he visited his restaurant frequently. He said he often arrived unannounced through the back door in order to observe his employees. He said the Defendant was previously employed as the general manager. He said that although the Defendant pre-screened applicants, he made all hiring and firing decisions. He said he issued all paychecks and determined employee pay rates. He said that he did not fire the victim but that she quit on May 10, 2008.

Mr. Webb testified that he first heard of the allegations against the Defendant on May 10, 2008. He said he spoke with the Defendant on the telephone and then immediately went to the restaurant to interview employees about the victim's allegations. He said he spoke with Mr. Dehler, Jennifer Loveday, Mr. Rouse, and three other employees. He said that he called the victim, that he asked her if she wanted to speak with him and if she was coming to work, and that she resigned. He said a civil complaint had been filed on the victim's behalf against the restaurant.

Mr. Webb testified that he had known the Defendant for sixteen years. He said he first met the Defendant when he hired him as a dishwasher at a Sbarro restaurant. He said he hired the Defendant to manage his restaurant when he opened Mangia Pizza and More. He said that he never witnessed the Defendant do anything inappropriate with an employee

and that he never had any complaints about the Defendant. He said the victim and Mr. Dehler never complained of the Defendant's actions. He said that he performed employee evaluations of the victim, the Defendant, and Mr. Dehler; that he ended each evaluation by asking if they had any questions, problems, or concerns; and that none of them raised any concerns or problems.

On cross-examination, Mr. Webb agreed that he did not receive complaints from the victim or the Defendant. He said the Defendant stopped working at the restaurant on May 10, 2008. He said that he trusted the Defendant to manage the restaurant and that he arrived at the restaurant unannounced regardless of who managed it that day. He agreed he had not been sued by anyone seeking money as a result of the Defendant's actions.

On redirect examination, Mr. Webb testified that the Defendant was placed on administrative leave and later resigned. In response to questions from the jury, Mr. Webb testified that he spoke with the Defendant on numerous occasions after May 10, 2008. He said he spoke with the victim before he hired her. He said the Defendant gave him information regarding the employees to be used during employee evaluations. When asked if the Defendant mentioned to him that the victim allegedly stole from her previous employer, he said "something" came up regarding her previous work at Marble Slab Creamery. He said that when he visited his restaurant, he would sometimes spend hours there or could leave after five minutes. He said that although he made the hiring decisions, he sometimes had the Defendant contact applicants to tell them they were hired. He said he completed two evaluations of the victim and of Mr. Dehler.

On recross-examination, Mr. Webb testified that he spoke with the Defendant in passing about five times when he saw the Defendant in public after May 10, 2008. He said he also spoke with the Defendant once or twice on the telephone. He said he did not think they discussed the case. He said that he never met with the Defendant's attorney to discuss the case and that the first time he saw defense counsel was on the morning of the trial. He said that he worked at his restaurant eight to ten hours per day, every day, but that he frequently went in and out of the restaurant to run errands. He said he never received any complaints about the victim. He agreed he trusted the Defendant to close the restaurant alone.

Jennifer Loveday testified that she was a manager at Mangia Pizza and More and that she began working there in June 2004. She said Mr. Webb performed all hiring, firing, payment, and evaluations of employees. She said Mr. Webb always came to the restaurant for thirty minutes when she opened it, returned for a couple of hours at lunch, and checked on the restaurant at night, for a total of about four hours per day. She said she worked with the Defendant, the victim, and Mr. Dehler. She said she worked with the Defendant and the

victim on Friday nights and occasionally on Saturday. She said that the Defendant never said or did anything inappropriate to her and that she never saw him touch or say anything inappropriate to the victim.

On cross-examination, Ms. Loveday agreed that Mr. Webb spent about four hours over the course of the day at the restaurant. She agreed that the Defendant was "like a brother" to her and that she was close to him. She agreed the Defendant sometimes made sexual jokes and comments at work, and she said he mostly made the statements to the men at the restaurant. She said the comments were not made about specific girls. She said that the restaurant did not have a crude atmosphere and that she never felt uncomfortable there. She agreed the atmosphere "shocked" her during her first week at work but said the atmosphere was "far better" than other places where she worked.

On redirect examination, Ms. Loveday agreed that the Defendant made crude jokes and comments in general. She said the comments were not directed at her, the victim, or other employees.

On recross-examination, Ms. Loveday testified that she did not normally work on Tuesdays and that she sometimes closed the restaurant on Fridays and Saturdays. In response to questions from the jury, Ms. Loveday testified that the Defendant did not hang around with employees younger than eighteen at work or after work. She said she normally left the restaurant on Saturdays between 9:00 and 9:45 p.m. She said that the Defendant never asked her for "sexual favors" and that she never saw the Defendant touch or say anything sexual to the victim. She said Mr. Webb spent about the same amount of time at the restaurant with her as he did with the Defendant, or "maybe" a little more time with her. She agreed that the Defendant and Mr. Dehler got along well and that she knew they went to a gym together after work on Saturdays.

Cindy Julian, the Defendant's wife, testified that she had been married to the Defendant for sixteen years and that they had two daughters. She said that their marriage was "great" and that she could not ask for a better husband or father for her children. She said that she assisted the Defendant at the restaurant "about 99 percent of the time that he was working" and that their daughters also spent time at the restaurant with them. She said the Defendant and employees at the restaurant would assist her daughters with their homework. She said she normally left the restaurant by 7:00 p.m. She said that she was frequently in the restaurant while the Defendant and the victim worked together and that she was there most Saturdays. She said the Defendant called her to inform her of the victim's allegations after the victim called him.

On cross-examination, Ms. Julian testified that her daughters were twelve and fourteen and that she brought them to the restaurant with her "99 percent" of the time the Defendant worked. She agreed that she was not paid by the restaurant and that she left before the restaurant closed. She said she went to the restaurant on Tuesdays after picking up her daughters from school. She agreed that the Defendant previously had an affair and that she remained married to him.

On redirect examination, Ms. Julian testified that the affair occurred ten years ago, that it happened once or twice, and that the Defendant told her about it as soon as it happened. In response to questions from the jury, Ms. Julian testified that she spent a lot of time at the restaurant because she loved her husband and they did everything together. She said their schedules allowed them to spend time together because she worked the third shift at her job. She said that Mr. Webb knew she was frequently at the restaurant and that he had no problem with her presence. She said that she frequently saw the Defendant and the victim work together and that she told the Defendant she thought the victim had a crush on him.

On recross-examination, Ms. Julian testified that she worked from midnight to 8:00 a.m., slept two to three hours during the day, and spent the remainder of the day at the restaurant with the Defendant. On redirect examination, Ms. Julian testified that sleeping for only two to three hours per day was normal when she worked the third shift.

The Defendant testified that he previously worked as the manager at Mangia Pizza and More for over six years. He said that the restaurant employed high school and college students and that half of the employees were female. He said at least three employees worked together at all times. He said that he had known the victim for about eight or nine years and that he knew her before they worked together because she and her family often came into a Sbarro restaurant where he previously worked. He said that he did not know the victim's name before working with her but that he was familiar with her from the other restaurant. He said he first heard the victim's allegations when she called him while he was at work. He said the victim's allegations were "absolutely not true."

The Defendant testified that he never made sexual comments to the victim or requested sexual favors from her. He said he never had any physical contact with the victim. He said he never touched her buttocks or her vagina. He said he never asked her to perform oral sex. He said he never saw the victim outside of work. He said that the only employee he saw outside of work was Mr. Dehler and that they worked out together. He said that he never called the victim from the gym to ask for oral sex and that he never asked the victim to have a threesome with him and Mr. Dehler.

The Defendant testified that he first heard the allegations that he took photographs of the victim when the police had her call him. He said he never took photographs of the victim, other than one depicting her and Mr. Dehler near the soft drink fountain. He said that he was opening the store when she called and that he continued moving around the store to perform his duties during the call. He said that he did not know what was "going on with the drama queen" that day and that he attempted to learn if something happened between the victim and another employee because she was involved with two other men who worked at the restaurant.

The Defendant agreed that he was charged with touching the victim inappropriately between August 2007 and May 2008, and he said that the only definite date the State provided regarding any of the allegations was May 6, 2008. He said that he attempted to determine where he was during the victim's shifts on Tuesdays and Saturdays but that it was impossible for him to determine where he was during each of the victim's shifts. He said he was often out of town with his family when the victim was scheduled to work.

The Defendant testified that the victim may have misinterpreted his actions during a Christmas party at Mr. Webb's house. He said that he gave the victim a hug and a "peck on the cheek" at the party, but that he did the same with other employees as well because he had a great relationship with all of his employees.

The Defendant testified that the restaurant's floor plan was essentially a large, open circle. He said there were always at least three employees at the restaurant. He said that at various times, Mr. Webb would "sneak in" and see what was occurring in his restaurant. The Defendant said he never took the victim into the office and locked the door. He said that he never asked the victim to lift her shirt to photograph her and that he never took a photograph of the victim performing oral sex on him.

On cross-examination, the Defendant agreed that the victim was a child when she came into the Sbarro restaurant with her family and that although he knew she was a teenager when she began working at Mangia Pizza and More, he did not know her exact age. He said that the victim worked there from August 2007 until May 2008 and that she was eager to work at the restaurant and constantly asked for a job before being hired. He said the restaurant was organized to allow female employees to work at the front and greet customers, while male employees prepared and handled the food. He agreed that he normally closed the restaurant and that part of his job involved telling employees when to clean the restaurant. He said that his wife exaggerated by stating she was at the restaurant "99 percent" of the time he worked, but that all the employees knew his wife and children.

The Defendant testified that he frequently worked with the victim on Tuesdays but that he also worked with Mr. Dehler, Mr. Rouse, and other employees. He agreed that he and Mr. Dehler got along well and that Mr. Dehler never caused any problems. He said that Mr. Dehler did not know how to deal with stressful situations and that he sometimes saw Mr. Dehler go to the back of the restaurant and cry instead of discussing a problem. He said that he did not treat Mr. Dehler unfairly and that Mr. Dehler was a "pretty honest kid." He agreed he worked out with Mr. Dehler. He agreed Mr. Dehler made "all this stuff up." He agreed Mr. Dehler lied when he testified that the Defendant informed him that he deleted the photographs of the victim and asked Mr. Dehler to take the blame.

The Defendant agreed the call he received from the victim on May 10, 2008, was unusual, but he said he occasionally called her from the restaurant to ask her to pick up supplies for the restaurant. He said that at the time, he was not sure if the victim's call was a prank. He said that he did not know "what was going on" or what the victim was talking about during the call and that he attempted to "get to the bottom" of the victim's claims. He said he was unsure if the victim thought she was talking to Mr. Dehler or Mr. Rouse, two employees at the restaurant with whom she had a relationship. He denied knowing that the conversation was recorded or that the police were listening. He said he repeatedly told the victim that they could not have the conversation over the telephone because he was not sure if she was joking or referring to the other men with whom she was involved. He said the victim previously called Mr. Dehler's girlfriend and made similar claims about having feelings for Mr. Dehler.

The Defendant testified that the victim was a "drama queen." He said the victim always brought her problems to work, whether it was an issue with her parents, her boyfriend, or the men at work. He agreed he never told Mr. Webb the victim was a drama queen but said he informed Mr. Webb about the victim's attendance at work and her sending text messages while at work.

The Defendant agreed that his cell phone had a camera and that he took photographs of some of the employees at the restaurant. He denied taking photographs of the victim's exposing her breasts or performing oral sex on him. He agreed his cell phone had the ability to delete items. He denied showing any photographs to Mr. Dehler and said Mr. Dehler may have been influenced to testify otherwise because of Mr. Dehler's relationship with the victim. He said that although Mr. Dehler testified he did not like the victim, "teens nowadays don't have to like each other to have those kind of relationships." He denied telling the victim that he would send photographs of her to a pornography website and said the victim previously stated she wanted to "grow up and make porn and do stuff like that." He said he informed the victim that she could not discuss things of that nature at work. He said he did not participate in any of the sexual comments exchanged among minor employees. He said

-14-

any comments he made were with employees older than eighteen. He said that the victim and Mr. Dehler were lying, that the victim lied to obtain money from the restaurant, and that Mr. Dehler lied to continue his relationship with the victim.

On redirect examination, the Defendant testified that the victim did not tell him she wanted to make pornography when she grew up but that the statement was made to other employees at work. He said that he never took photographs of the victim and that he never told the victim he would send photographs of her to a pornography website. He said he called his wife and Mr. Webb immediately after the victim called him on May 10, 2008, and told them of the victim's allegations.

In response to questions from the jury, the Defendant testified that he never hugged or kissed the victim in the women's restroom. He said he resigned to avoid hurting the restaurant in the event that the victim's allegations became public, not because he did anything inappropriate to the victim. He said he did not call Mr. Dehler after speaking with the victim on May 10, 2008. When asked what he observed regarding the victim's relationship with Mr. Dehler, he said he saw the victim and Mr. Dehler leave work together.

Tyler Rouse testified that he worked at Mangia Pizza and More, that he had been employed there for three years, and that he often worked with the Defendant. He said he worked shifts when the Defendant, the victim, and Mr. Dehler were also working together. He said he did not see any physical contact or anything of a sexual nature between the victim and the Defendant. He said that the restaurant had an open floor plan and that he worked all around the restaurant. He said that although he heard the Defendant and others make inappropriate jokes, they were not directed toward any particular person. He said he got along well with the Defendant and Mr. Dehler, but not with the victim. He said the victim came to his house one time after work and agreed he and the victim were not "just friends" at the time. He said that he previously worked on Tuesdays with the victim, but that in the beginning of 2008 he asked Mr. Dehler to cover his Tuesday shifts because he no longer got along with the victim.

In response to questions from the jury, Mr. Rouse testified that the victim "came on to" him at work. He said he worked on Tuesdays from 5:00 p.m. until the restaurant closed and on Saturdays from around noon until the restaurant closed. He said the Defendant's wife and children stopped by the restaurant "every now and then" and stayed for thirty minutes or an hour. He said that aside from the one time the victim came to his home, he did not associate with the victim outside of work. He said the victim's attitude made her hard to get along with. He said he never saw the Defendant call the victim on the telephone. He did not remember any specific inappropriate jokes told in front of employees younger than eighteen. He said he did not spend time with the Defendant outside of work.

-15-

On cross-examination, Mr. Rouse agreed that he was younger than eighteen when he heard sexual jokes at the restaurant. He said the Defendant participated in the jokes as much as any of the employees. On redirect examination, Mr. Rouse testified that the victim was "kind of angry" and that she yelled and complained at work about her problems.

Upon this evidence, a Knox County Criminal Court jury convicted the Defendant of three counts of sexual battery by an authority figure and one count of sexual exploitation of a minor. He was sentenced as a Range I, standard offender to three years' probation for each of the sexual battery convictions and two years' confinement for the sexual exploitation conviction, to be served concurrently. This appeal followed.

## I

The Defendant contends that the evidence was insufficient to support his convictions for sexual battery by an authority figure because it was not established that the Defendant used his position of trust or power over the victim to accomplish sexual acts. He argues that the evidence was insufficient to support his sexual exploitation conviction because no photographs were ever admitted into evidence. The State contends that the evidence was sufficient to support the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As applicable to this case, sexual battery by an authority figure is

> unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:
>
> (1) The victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age [and]
>
> . . . .

(3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact[.]

T.C.A. § 39-13-527. This court has noted that "the statute prohibits the Defendant from 'us[ing] such power to accomplish the sexual contact'; the statute mentions nothing about using the position to force the sexual contact." State v. Bryan Dale Farmer, No. M2007-01553-CCA-R3-CD, Montgomery County, slip op. at 8-9 (Tenn. Crim. App. Aug. 18, 2008) (holding that the evidence was sufficient to support the conviction when the record reflected that the defendant, a school teacher, cultivated his relationship with a student during school hours and used his office to engage in sexual acts with the student), app. denied (Tenn. March 2, 2009). If evidence establishes that a defendant used a supervisory position to bring about or bring to completion the resulting sexual contact, such evidence is sufficient to support a conviction for sexual battery by an authority figure. Id. Sexual contact is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (2010). Intimate parts include "the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

Sexual exploitation of a minor occurs if a person knowingly possesses material that includes a minor engaged in sexual activity or simulated sexual activity that is patently offensive. T.C.A. § 39-17-1003. A person acts knowingly if he is aware of the nature of his conduct. See T.C.A. § 39-11-106(20) (2006) (amended 2009).

The three convictions for sexual battery by an authority figure related to incidents when (1) the victim performed oral sex on the Defendant in the office on May 6, 2008; (2) the Defendant touched the victim's vagina outside her clothing while they stood behind the pizza station; and (3) the Defendant touched the victim's buttocks outside her clothing while she walked to the drink station. Taken in the light most favorable to the State, the victim testified that the Defendant touched her buttocks when she walked to the drink area. She said the Defendant touched her vagina over her clothes while she was behind the pizza station. She said that the Defendant asked her to perform oral sex on him and that she did so "a few times" in the office, with the last incident occurring during her last day at work on May 6, 2008.

The victim testified that the Defendant also used his cell phone to take photographs of her breasts and of her performing oral sex on him. She said that she was able to glance at the photographs of her on his phone when he showed them to her quickly but that she was not able to see them well. She said Mr. Dehler also saw the photographs.

The victim agreed she did not want to have sexual contact with the Defendant but said the Defendant "persuaded" her. She said the Defendant told her not to move when he touched her and that no one would believe her if she said anything about the sexual incidents. She said that although the Defendant never used physical force against her, she felt obligated to engage in the sexual acts because the Defendant was her boss. She said that all of the sexual incidents occurred at the restaurant during work hours or as the restaurant closed and that some of the incidents occurred in the Defendant's office.

Mr. Dehler testified that he saw the Defendant grab the victim's buttocks and that the victim did not react to the Defendant when he touched her. He said that he saw the Defendant put his hand down the front of the victim's pants while they stood near the dishwashing area. He said that the Defendant showed him photographs on the Defendant's cell phone of the victim and that the Defendant showed him a photograph of the victim about ten to fifteen minutes after leaving the office. He said that one photograph appeared to show the victim performing oral sex on the Defendant. He said that after the Defendant was contacted by the police, the Defendant told him he deleted the photographs from his cell phone and asked Mr. Dehler to take the blame and tell the police that Mr. Dehler took the photographs of the victim as a joke.

We conclude that a rational trier of fact could have found the elements of sexual battery by an authority figure and sexual exploitation of a minor beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

**II**

The Defendant contends that the State's failure to provide a bill of particulars containing more specific dates of his offenses deprived him of a fair trial and the ability to prepare a defense. He argues that the lack of specificity regarding the dates of the offenses prevented him from developing an alibi defense and from interviewing employees who worked on the dates of the offenses. The State argues that the bill of particulars was substantially similar to the testimony given by the victim at the trial, that more specific dates were not available, and that the Defendant has not established he was prejudiced in his ability to prepare a defense due to any lack of specificity. We agree with the State.

Tennessee Rule of Criminal Procedure 7(c) states that "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." The purpose of a bill of particulars is to provide a defendant with sufficient information about the charged offense to allow the defendant to (1) prepare a defense, (2) avoid prejudicial surprise at the trial, and (3) preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn.1991) (citing State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)). The State should make every effort to provide descriptive information of the offense and narrow the time-frame of the indictment, even if exact dates are unavailable. Byrd, 820 S.W.2d at 742.

> If, however, the state is truly unable to give even an approximate time of the alleged offense by means of descriptive reference, a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity. Conversely, a conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant.

Id. "If the State significantly deviates from the bill of particulars at trial, this potentially could be a ground for reversal, but only if a defendant can . . . demonstrate prejudice in the form of unfair surprise or inability to prepare an adequate defense." State v. Sherman, 266 S.W.3d 395, 409 (Tenn. 2008) (citing Byrd, 820 S.W.2d at 741).

Although count two of the presentment charged the Defendant with receiving oral sex on May 6, 2008, the remaining counts charged the Defendant with sexual offenses occurring between August 19, 2007, and May 3, 2008. In two bills of particulars, the State provided additional descriptions of the offenses, listed the locations within the restaurant where the offenses occurred, stated that the touching and photography incidents occurred primarily on Tuesdays and Saturdays between 5:00 and 11:00 p.m., and that oral sex incidents began in November 2007 and occurred during the evening hours after the restaurant closed. The State asserted that it was unable to provide more specific dates of the offenses.

At the trial, the victim testified that although the Defendant touched her buttocks and vagina on numerous occasions, she did not remember specific dates when the touching occurred. She said the oral sex began after her seventeenth birthday on October 30, 2007, and continued over the course of her employment. She said the Defendant asked her to perform oral sex on him and take a photograph during her last shift at work on May 6, 2008.

-19-

She was unable to recall the dates of previous incidents of oral sex. The victim's testimony at the trial regarding the dates of the offenses was consistent with the information provided by the State in the presentment and bills of particulars, except for her testimony that the Defendant took a photograph of her performing oral sex during her last day of work. Although the Defendant was not informed before the trial of the victim's allegation that he took a photograph of her performing oral sex on May 6, 2008, nothing in the record indicates that the State was aware of this allegation before trial but withheld it from the Defendant. Furthermore, the Defendant was informed in the bill of particulars of the victim's allegation that she performed oral sex on him on May 6, 2008.

The record reflects that the sexual incidents occurred repeatedly over the course of many months during the victim's employment, and the Defendant has not established that his defense was hampered by the lack of specificity regarding the dates of his offenses. The Defendant was informed of the nature of the sexual contact alleged by the victim, where the offenses occurred, the days of the week and the approximate time of day when the offenses occurred, and the span of time in which they occurred. Defense counsel throughly cross-examined the victim regarding her recollection of the offenses, her inability to remember when they occurred, and her potential motivations for falsely accusing the Defendant. Multiple people testified on behalf of the Defendant regarding his interactions with the victim and other employees at the restaurant.

Regarding an alibi defense, although the Defendant testified at trial that he was often out of town with his family when the victim was scheduled to work, he did not mention any dates when he was traveling or otherwise make an offer of proof to establish an alibi defense at the trial or during his motion for a new trial. Regarding the Defendant's inability to interview employees who worked on the dates of the offenses, the record reflects that the victim normally worked with Mr. Dehler or Mr. Rouse, both of whom testified at trial. Mr. Dehler was present when offenses occurred on May 6, 2008, and he testified regarding his observations on that date. The Defendant has not identified the additional employees he sought to interview. The record does not reflect that the Defendant was unable to prepare a defense to the charges, and he has not established otherwise. The Defendant is not entitled to relief.

### III

The Defendant contends that the trial court erred by denying his request to question witnesses about the existence of a sexual relationship between the victim and Mr. Dehler in order to challenge Mr. Dehler's credibility. He argues that the questioning was admissible pursuant to Tennessee Rule of Evidence 616. The State asserts that the trial court did not abuse its discretion by limiting the Defendant's questioning regarding the victim's

relationship with Mr. Dehler and that Tennessee Rule of Evidence 412 barred the admission of evidence establishing a sexual relationship between the victim and Mr. Dehler. We agree with the State.

Rule 616 states that "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." As applicable to this case, Rule 412 states that

> (b) Reputation or opinion. – Reputation or opinion evidence of the sexual behavior of an alleged victim of such offense is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule and required by the Tennessee or United States Constitution.
>
> (c) Specific instances of conduct. – Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> > (1) Required by the Tennessee or United States Constitution, or
> >
> > (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim[.]

Subdivision (d) requires a party, in part, to file a motion at least ten days before trial, containing a written offer of proof describing the specific evidence and the purpose for introducing it. See Tenn. R. Evid. 412(d). Sexual behavior constitutes "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there is an abuse of discretion. See State v. Samuel, 243 S.W.3d 592, 599 (Tenn. Crim. App. 2007).

Before the trial, the Defendant filed a notice of his intent to question witnesses about a sexual relationship between the victim and Mr. Dehler and to offer proof of a sexual relationship in the event such a relationship was denied. He stated that he did not want to present proof of specific instances of sexual activity and that the purpose of the questioning

was to test Mr. Dehler's credibility and establish his bias in favor of the victim. The Defendant's written notice did not state the specific proof he sought to introduce, and the State's response noted the Defendant's failure to comply with Tennessee Rule of Evidence 412(d)(1)(iii). At the pretrial hearing, the Defendant again failed to indicate the specific proof he sought to introduce, and the prosecutor stated, "we need to know what that proof is before we determine whether or not it's appropriate." The trial court ruled that the Defendant could ask whether the victim and Mr. Dehler had a "romantic" or "intimate" relationship and that the Defendant could present proof of a romantic relationship if such a relationship was denied. The Defendant was prohibited from asking if the victim and Mr. Dehler had a "sexual relationship" or presenting proof of sexual activity.

We conclude that Tennessee Rule of Evidence 412 barred the admission of evidence establishing a sexual relationship between the victim and Mr. Dehler. The Defendant failed to make a written offer of proof before trial describing the specific evidence he sought to introduce, as required to introduce reputation and opinion evidence or evidence of specific instances of sexual conduct. See Tenn. R. Evid. 412(d); see also State v. Benjamin F. Dishman, No. 03C01-9610-CR-00361, Sullivan County, slip op. at 23 (Tenn. Crim. App. April 23, 1998) ("The policies behind the rape shield law require strict compliance with the procedures set forth in Tenn. R. Evid. 412(d). '[P]rior sexual behavior with others by the victim is altogether [inadmissible] unless there is compliance with Rule 412(d) . . . .'") (quoting State v. Stephen Ray Stamps, No. 03C01-9504-CR-00111, Henry County (Tenn. Crim. App. March 2, 1994)); State v. Ray Vance, No. 01C01-9610-CC-00425, Stewart County, slip op. at 8 (Tenn. Crim. App. Dec. 3, 1997) ("The notice provisions of Rule 412 are mandatory."), app. denied (Tenn. Sept. 21, 1998).

Furthermore, the limitations the trial court placed on the questioning and evidence of the victim's relationship with Mr. Dehler did not, as the Defendant claims, deny him the opportunity to show the jury that Mr. Dehler's testimony should be suspect and biased in favor of the victim. The only evidence the trial court excluded was that related to whether the victim engaged in sexual activity with a fellow high school student. The Defendant was permitted to ask whether the victim and Mr. Dehler had a "romantic" or "intimate" relationship and to present proof of a romantic relationship if it was denied. Defense counsel failed to use either of these terms during his questioning of Mr. Dehler at the trial and instead asked if Mr. Dehler and the victim "dated" or were "involved in any way." After Mr. Dehler denied dating or being involved with the victim, the Defendant presented no evidence to establish that the victim and Mr. Dehler had any relationship outside of work, other than his own testimony that the victim had a relationship with male employees, including Mr. Dehler. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred by admitting a recorded telephone conversation between the Defendant and the victim. He argues that the trial court should have excluded the recording pursuant to Tennessee Rule of Evidence 403; that the conversation had little probative value because he denied the accusations; and that it had a substantial prejudicial effect because it captured the tone of his awkward, surprised, and confused response. The State argues that the Defendant waived this issue by failing to refer to the record or cite relevant authority in his appellate brief. The State also argues that the trial court did not abuse its discretion by admitting the recording because the probative value was not substantially outweighed by the danger of unfair prejudice. We agree that the trial court did not abuse its discretion by admitting the recording.

Tennessee Rule of Appellate Procedure 27 requires a defendant on appeal to make appropriate references to the record and provide citations to relevant authorities in the argument portion of his brief. See T.R.A.P. 27(a)(7). "Failure to do so will ordinarily constitute a waiver of the issue." State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)).

The State correctly notes that the Defendant's argument fails to make appropriate references to the record. The Defendant argued, however, that his telephone conversation with the victim, which was the only telephone conversation admitted into evidence, should have been excluded pursuant to Tennessee Rule of Evidence 403. Under these circumstances, we hold that the Defendant has not waived this issue.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there has been an abuse of discretion. See Samuel, 243 S.W.3d at 599.

In the recorded telephone call that was played for the jury, the victim told the Defendant she wanted to "talk about us . . . whenever that stuff goes on . . ." She stated that she had feelings for the Defendant, and he responded, "No way, no way. How?" He told her not to have feelings for him and that she could only have feelings for "Brad, Tyler, or even Chase." She asked him how she was supposed to feel when she performed oral sex on him

"all the time." He responded, "Yeah right, I wish that was true. I wish I was Tyler in that instance." The victim stated that she "didn't do that to Tyler," and the Defendant stated, "I wish that was true." He said the only thing he had done to the victim was give her a hug and "maybe a peck on the cheek" and asked what she was talking about. She stated, "No, you know we've done more. What about those pictures?" The Defendant stated, "What pictures? There ain't no pictures. What are you talking about?" The victim said she was referring to pictures of her performing oral sex on the Defendant, and he stated, "I don't know what we're talking about here. You might have me confused with Brad or Tyler." He said there was "no way" he would do something like that because he was married.

The victim stated that she would not come into work that day and that she would tell someone about the pictures. The Defendant stated, "There are no pictures. I don't know what you are talking about." She stated the Defendant told her that he emailed the pictures to himself and that he would post them on the Internet. He said that if he had said that, he was joking and that he "knew better" than to do that. He stated, "If you and I were to do something, it wouldn't be at work." He asked her why she called him on the telephone to have the conversation and said that if she wanted to speak with him, they needed to do it in person.

The victim stated she was worried that the pictures would cause her to be dismissed from school, and the Defendant responded, "If it was something to worry about, it would be a different story, but it's not." She stated that she wanted the "sexual stuff" to move forward if the Defendant did as well, or else it needed to stop. He responded, "I can't have anything move forward . . . I have a wife and kids." She said she wanted their relationship to move forward, and the Defendant responded that they could speak but that he was "clueless" about what she was talking about and was "caught off guard." He said he did not know that she had feelings for him.

The victim stated that the Defendant could not lie to her, that he took photographs of her, and that Mr. Dehler also knew the Defendant took the photographs because he showed them to Mr. Dehler while she was present. The Defendant said the only photograph he showed Mr. Dehler was of his dog. The victim said the Defendant showed Mr. Dehler photographs of her lifting her shirt and told Mr. Dehler, "Look what you're missing out on." The Defendant responded, "you and I cannot have this conversation on the phone."

The victim said she did not understand why the Defendant wanted her to perform oral sex if he had a wife and children. He responded that he was confused and that the victim may have imagined things. She asked the Defendant if he cared about her, and he responded, "I care about you . . . you're a good kid . . . you're a friend of mine." He stated that he never told her to perform oral sex and that he never asked her to take photographs. She said she

-24-

was scared that others would see the photographs. He responded, "If that's what you're scared about, nothing like that could have happened . . . you also said before that you were going to go into porn, you know, nothing like that's ever going to happen. There ain't s- - - to worry about." He stated that there were no photographs of her on his cell phone and that he did not email any photographs to himself. He said that if he were to take photographs of someone the victim's age, he would not keep the photographs on his phone or send them to his home email. He said that he was confused and that he did not know what was going on. He again said that if the victim wanted to speak, they needed to do it in person. The call ended with the victim's telling the Defendant that she would tell her mother what happened.

In admitting the evidence, the trial court noted that the Defendant denied the victim's allegations during the recorded conversation and stated that the recording was admissible if the Defendant was provided the opportunity to cross-examine the victim regarding the recording. The trial court did not make a ruling on the probative value as compared with the potential prejudicial effect of the evidence.

We conclude that the telephone conversation was relevant and probative because it assisted the jury's understanding of the relationship between the victim and the Defendant and provided the jury with the Defendant's initial reaction to the victim's allegations. Although the recording captured the tone of the Defendant's response to the allegations, an awkward, surprised, and confused response is not an unnatural reaction after a person first hears allegations that he engaged in illegal behavior. Furthermore, any prejudicial effect of the call was slight because the Defendant repeatedly denied the victim's allegations during the call, stated that he had no idea what the victim meant, and questioned whether she was confusing his actions with those of Mr. Dehler or Mr. Rouse. We conclude that the probative value of the recorded conversation was not substantially outweighed by the danger of unfair prejudice and that the trial court did not abuse its discretion by admitting the recording.

V

The Defendant contends that the State's election of the offenses in counts three and five were not specific enough to ensure jury unanimity. The State contends that it elected specific instances when the Defendant touched the victim and that the jury's verdict was unanimous as to the specific offenses elected in counts three and five. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137

(Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000).

Count three charged the Defendant with unlawfully placing his hand upon the victim's vagina, and count five charged the Defendant with unlawfully placing his hand upon the victim's buttocks. The Defendant argues that because the victim testified to multiple incidents when the Defendant touched her buttocks and vagina, there was no way to distinguish any specific allegation in order to preserve the unanimity of the jury verdict. We disagree. The Defendant correctly notes that the victim testified that the Defendant touched her in various locations throughout the restaurant. She mentioned, however, only one specific incident when the Defendant touched her vagina over her clothing and said the Defendant did so while she stood behind the pizza station. With regard to count three, the record reflects that the State elected the incident when the Defendant touched the victim's vagina outside her clothing while they stood behind the pizza station. With regard to count five, the victim testified that the Defendant touched her buttocks in the women's restroom, when she cleaned underneath tables in the dining room, and when she walked to the drink area. The record reflects that the State elected the incident when the Defendant touched the victim's buttocks outside her clothing while she walked to the drink station and that the jury was instructed to consider only this incident when determining their verdict. The record reflects that the jury's verdict was unanimous as to the specific offenses elected in counts three and five. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE