# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 10, 2012

## STATE OF TENNESSEE v. ISAAC MCDONALD, JR.

### Appeal from the Circuit Court for Madison County
#### No. 10-532      Roger A. Page, Judge

### No. W2011-01233-CCA-R3-CD  - Filed June 28, 2012

The defendant, Isaac McDonald, Jr., was convicted by a jury of attempted aggravated rape, a Class B felony, and sentenced to serve twelve years in prison.  On appeal, the defendant contends that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, J.J., joined.

George Morton Googe, District Public Defender; and Paul E. Meyers II, Assistant Public Defender, for the appellant, Isaac McDonald, Jr.

Robert E. Cooper, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. Woodall, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The charges at issue arose when the victim[1] left a small party and was attacked while sitting in her car in the parking lot of an apartment complex during the early morning hours of May 15, 2010.  After the police responded to two separate 911 calls, the defendant was arrested, charged with aggravated rape, and tried by a jury.

The State's proof at trial began with the testimony of Tommy Ferguson, an officer

---

[1]In accordance with the policy of this Court to protect the identity of victims of sexual assault, we will refer to the victim simply as "the victim."

with the Jackson Police Department. Officer Ferguson testified that he was dispatched to an apartment complex to respond to a 911 call regarding a woman screaming and regarding the occurrence of a crime and presence of the victim and perpetrator. When Officer Ferguson arrived, two patrol cars were already on the scene. Officer Ferguson testified that at the scene, he collected women's underwear, which were dirty and muddy and torn apart on one side and which he recovered from a dusty, grassy area near the air conditioning units at the southeastern corner of the building. Officer Ferguson testified that he spoke with the victim and photographed her. Several photographs of "marks and injuries" that Officer Ferguson observed on the victim were entered into evidence.[2] Officer Ferguson testified that the victim had dirt on her back, face, knees, neck, elbows and upper arms around her shoulders. The victim had red marks and abrasions on her body under the areas with dirt on them; Officer Ferguson likened them to injuries a football player would receive after being tackled and held down struggling in the dirt. Her clothing was disarrayed. The victim had been crying and was distraught and emotional. On cross-examination, Officer Ferguson testified that he had fingerprinted the victim's car and did not find any fingerprints on it.

Robert Groves, another officer with the Jackson Police Department, was the State's next witness. Officer Groves testified that he was dispatched to the apartment complex following a 911 call regarding a female voice crying and that en route he was informed of another call reporting a sexual assault and informing police that the suspect had been chased into an apartment. Officer Groves, who was one of the first two cars on the scene, saw two men standing outside a downstairs apartment. One of the men, Caleb Thomas, informed him that he had seen the man who lived in the apartment attack his friend and they had chased the man back into the unit. Officer Groves testified that he saw the defendant removed from the apartment Mr. Thomas had indicated. Officer Groves testified that he observed the victim that night, and that she was hysterical and barely able to talk. The victim was crying and had dirt on her face, arms, and clothing and had red marks on her arms. Officer Groves testified that the defendant's family members let the police in and told them the defendant was in his room. They found the defendant lying on the bed, wearing a pair of shorts with no shirt or shoes on. The defendant was cooperative from the time he was handcuffed in the bedroom to the time he was walked outside. Outside there was a confrontation between the victim's friends and the defendant's family, and another officer had to "conduct a takedown" of the defendant, who was trying to "get to another party." The defendant did not ever ask why he was being arrested. On cross-examination, Officer Groves testified that he did not find forty dollars or a Kodak camera in the defendant's residence and did not know if those items were ever found. Officer Groves also testified that he went upstairs to the apartment of the victim's friend, Kristen Elder, and that while he could tell that the persons present – the victim, Ms. Elder, Mr. Thomas, and the other man who had been outside the defendant's

---

[2] The record does not contain the exhibits introduced at trial.

apartment – had been drinking, he did not notice any severe intoxication. He stated the defendant was handcuffed when he was taken down, and possibly could have landed chest- and head-first.

Thomas Bray, who was also a police officer with the Jackson Police Department, largely corroborated the testimony of Officer Groves regarding the defendant's arrest. He confirmed that the victim had been crying, was covered with dirt on her arms and clothing, and had what appeared to be a handprint on her arm. He testified that the defendant's family, which consisted of his mother, father, sister, and girlfriend, appeared to be awake and told officers the defendant was asleep in his bedroom. Officer Bray testified the defendant appeared to be sleeping and was wearing dark shorts and a t-shirt. Officer Bray testified that during the altercation outside, the defendant tried to pull away from him and he put the defendant to the ground. The defendant vomited by the patrol car. Officer Bray took the defendant to jail and collected his shorts and boxers. The defendant did not ask why he was being arrested. Officer Bray testified on cross-examination that the defendant fell chest first when he was taken down and hit the ground with a lot of force.

Susan Cole, an investigator with the Jackson Police Department, testified that she photographed the defendant at the jail in the middle of the afternoon. A photograph showing a small abrasion on the side of the defendant's head was entered into evidence. On cross-examination, Investigator Cole testified she also photographed the defendant's neck and hands, looking for a bite mark. She testified she did not find one.

Another investigator for the City of Jackson Police Department, Danielle Jones, testified that she was involved in sending evidence, including a saliva standard from the victim, a saliva standard from the defendant, swabs from the victim's hospital examination, and the victim's underwear, to the TBI crime lab. No DNA evidence was recovered. Investigator Jones also testified that she advised the defendant of his rights, and that he understood his rights, agreed to waive them, and gave a statement. The defendant's statement asserts he was at an upstairs apartment while his mother and father were visiting his uncle. According to his statement, he obtained money from his parents, gave it to someone to get him drugs, had a beer at his home, and then went to Ms. Elder's party. The defendant's statement asserts that he went straight home from the party, did not see anyone or hear cries for help, and did not rape anyone.

The State next called Stephanie DeWitt, an sexual assault nurse examiner at Jackson-Madison County General Hospital. Nurse DeWitt testified that she took vaginal swabs and swabs from the victim's fingernails. She testified that the victim remembered struggling but could not remember if she had scratched the assailant, and the swabs were taken in case she had scratched him without knowing it. Nurse DeWitt testified that the

victim had complained of lower back and vaginal pain and reported that she had been penetrated. The victim was crying, and "was dirty from head to toe." The victim's hair was messed up, and she had what appeared to be dirt on her dress, on her legs, and in her labia minora. Nurse DeWitt testified that the victim made eye contact and did not vary her account of what had happened. The patient reported being hit and pushed and reported that the assailant had threatened to kill her and kill her daughter. Nurse DeWitt testified that the victim reported that the assailant had ripped her underwear off at the scene. The victim's clothing was collected and was entered into evidence at trial. Nurse DeWitt testified that she checked the box indicating "no injuries noted" when performing the examination. She indicated that she would report broken bones or wounds requiring sutures or cleaning, but it was possible that the victim had minor abrasions that were not noted in the report.

On cross-examination, Nurse DeWitt confirmed that the victim stated she had been hit all over, but that the report stated that the examination revealed no bruises, abrasions, or scrapes. Nurse DeWitt acknowledged that in response to questions asking whether the assailant had various kinds of sexual contact with her, the victim stated, "I just hurt down there. He was on top of me and it was dark outside and I couldn't see." However, Nurse DeWitt stated that the victim had made that statement in reference to a question regarding anal contact. Nurse DeWitt indicated that blood and urine were collected from the victim for toxicology, but did not know if the testing was performed. She testified that the victim did not claim that someone had put something in her drink. Nurse DeWitt testified that the victim was tearful and tense but that she did not need medication to calm her down and that her heart rate and blood pressure were normal. On re-direct, Nurse DeWitt testified that the victim was sure the assailant's penis had penetrated her, and the comment stating the victim "just hurt down there" could have been regarding digital contact.

Another registered nurse, Regina Kris Phippen, testified that she did not remember treating the victim; however, Nurse Phippen identified a medical record in which she had documented abrasions on the victim's right and left knees and redness on the patient's right upper arm.

Kristen Elder, the hostess of the party the victim had attended, testified that the defendant lived in a downstairs apartment. Ms. Elder testified she was nineteen at the time of the party, at which guests were drinking alcohol. Ms. Elder testified that Garrison Rogers, Caleb Thomas, the victim, and the defendant were some of the guests in attendance and that the victim had been drinking alcohol and was intoxicated "[t]o a point." The victim went to her car and Ms. Elder eventually went to check on her. At that point, she did not appear intoxicated. Ms. Elder later heard the victim was passed out in her car. Within five minutes, Ms. Elder and Caleb Thomas went to check on her and found her passed out; they decided to go upstairs to get some washcloths to revive her. When they went upstairs, the defendant

-4-

stated he had to go do something and that he would be right back. The defendant then left the party. After about five or ten minutes, Caleb Thomas went to check on the victim; he returned to the party and let Ms. Elder know that the victim was not in her vehicle. Ms. Elder, Caleb Thomas, Garrison Rogers, and Randall Ramey went to search for the victim, walking around the back two buildings. Mr. Thomas looked around a building where a field starts, and "yelled that he saw them." Ms. Elder did not see the defendant, but she saw the victim when she came around the building. The victim had just gotten off the ground, and she was hardly able to speak. Ms. Elder testified that the victim was sweating, crying, and covered in mud, that the victim's dress was "all messed up," and that the victim had small scratches all over her arms and legs. Ms. Elder testified that the victim's face looked as though she had been hit several times. Ms. Elder assisted the victim, who was shaking so badly that she could barely walk, up the stairs to her apartment. The victim wanted to shower, but Ms. Elder advised her not to and instead used a washcloth to wash her face and neck.

On cross-examination, Ms. Elder testified that the victim had arrived at the party around midnight. She knew that the victim had been drinking but did not know what or how much she had; Ms. Elder testified that the victim "didn't appear to be very intoxicated." The victim left the party with her cousin and her cousin's girlfriend for about fifteen or thirty minutes and returned around one o'clock. Ms. Elder testified that she did not appear more intoxicated when she returned. According to Ms. Elder, the victim at one point began to sober up, and she did not know "if she passed out from drinking or just from something else." Although on direct examination she had testified that the defendant left while the victim was passed out in her car, on cross-examination, Ms. Elder testified that after the victim returned to the party, the defendant left and the victim then went outside to her car. Ms. Elder testified she checked on the victim within fifteen minutes, and found her passed out. Ms. Elder did not observe the victim vomit, but saw vomit by the victim's car. Contrary to her testimony on direct examination, Ms. Elder testified she only checked on the victim once while she was in her car. She did not hear screaming, struggling, or fighting from her apartment or while she was searching the complex for the victim. Ms. Elder acknowledged that a person outside at the complex would be able to hear a scream coming from the field. She testified that the two units closest to her apartment were empty. Ms. Elder testified that she did not call the police, but Mr. Thomas called his father, who was a police officer. On redirect, she testified that she and her guests were listening to music in the apartment.

Garrison Rogers, Ms. Elder's boyfriend, corroborated much of Ms. Elder's testimony. However, Mr. Rogers testified that the victim, who was dropped off at the party by her cousin, had been drinking heavily prior to arriving. He testified that the victim was in a car, that she was "pretty drunk," and that he did not think that "she could have gotten in it at that time by herself." The victim was sleeping, and when Mr. Rogers attempted to speak to her,

she would only mumble. Mr. Rogers testified that the defendant left the party shortly after the victim arrived. Mr. Rogers saw the defendant down at the victim's car with the victim. He testified that the victim's friends had not wanted to leave her alone in the car, and he thought the defendant "was just down there helping us . . . keep a[n] eye on her and . . . smoking and talking to other people." He testified that the defendant did not return to the party to socialize and was mostly "down there" after the victim was dropped off; he did not remember if the defendant might have returned to retrieve something.

Mr. Rogers testified that Mr. Thomas later alerted him to the fact that the victim was not in her car. He did not hear anything while he and the others searched for her outside. Mr. Rogers then saw Mr. Thomas go around one end of the apartments and heard him shout, "Get off her, you bastard." Mr. Rogers saw the victim come around the corner. She appeared either to have tripped or to have been thrown. Her clothes looked "like she'd been in a fight or something," and her skirt was pulled up. She did not have on underwear and was crying. Mr. Thomas began to run around the building, and Mr. Rogers ran back through a breezeway; he came out the other side right behind Mr. Thomas. Mr. Rogers observed the defendant, whom he had seen and spoken to multiple times at Ms. Elder's apartment, running in front of Mr. Thomas. He testified he was absolutely certain that it was the defendant. The defendant ran around the corner of the breezeway leading to his apartment. When Mr. Rogers arrived in the breezeway, Mr. Thomas was standing in front of the defendant's door and the defendant was gone. Mr. Rogers knocked hard on the door, but no one responded. Mr. Rogers did not move from the doorway until after he saw the police pull up. At that point, he went upstairs and spoke with the victim. The victim's face was scraped, and she was dirty; she "never stopped crying." On cross-examination, Mr. Rogers testified he had had one shot and two or three beers that night. He testified that he observed the victim vomit outside her car soon after she arrived at the party. Mr. Rogers stated that when he observed the defendant run into the breezeway, he was about forty yards away and primarily saw the defendant's back.

Caleb Thomas testified that he arrived at the party around eleven or twelve o'clock and that at that time, no one was drinking. When he arrived, the victim was in her car with her eyes closed. Mr. Thomas went upstairs and told the other guests about the victim. The defendant was at the party when Mr. Thomas arrived, and Mr. Thomas saw him leave. Mr. Thomas eventually decided to leave the party, and on his way out, he noticed that the victim was not in her car. He returned upstairs and told the others at the party that the victim was not in her car. Mr. Thomas joined Ms. Elder, Mr. Rogers, and Randall Ramey to search for the victim. Mr. Thomas testified he was walking near the woods when he came around a corner and saw the victim and a man. It was dark and he could not at first identify the man, but when the man ran to a lighted area he recognized the defendant, whom he had seen several times before at Ms. Elder's apartment. Mr. Thomas testified he was positive the man

-6-

he saw was the defendant. When he came around the corner, Mr. Thomas saw the victim struggling with the defendant, who "had his hands on her pushing her back toward the wall." Mr. Thomas testified that the victim saw him and cried, "Help me, help me," and that he shouted, "Stop, you bastard." The defendant saw him and began to run. Mr. Thomas testified that he chased the defendant and saw him enter the apartment he knew to be the defendant's residence. He testified that they "beat on" the door and received no response; this occurred at approximately 2:00 or 3:00 a.m. Mr. Rogers and Mr. Ramey then watched the two doors of the apartment while Mr. Thomas went upstairs to call the police and see the victim. The victim was dirty and "in tears." Mr. Thomas also found the victim's underwear on the ground in the area where he first saw the victim and the defendant.

On cross-examination, Mr. Thomas testified that he had had two beers earlier in the evening. He testified that the victim was not checking text messages in her car and that her car was not running. Mr. Thomas testified that he was inside Ms. Elder's apartment for an hour or two and that he had his eyes closed during part of that time. He testified that he heard no screams while he was searching outdoors for the victim, but that he heard "noises like bickering" or "people talking or struggling." He testified that the victim did not scream until she saw him, and that both the victim and the defendant were standing up when he saw them. On re-direct examination, Mr. Thomas testified that the defendant's hands were on the victim in her shoulder area; after refreshing his recollection with his prior statement, he testified that the defendant appeared to be pushing the victim but that he "could not tell if he – looked like he was strangling her or not."

Michael Wakham, who lived in the far right apartment on the ground floor of the complex where Ms. Elder and the defendant lived, testified that in the early morning hours of May 15, 2010, he woke up and heard somebody say, "I just want to go home." He thought he might have been dreaming, but then heard the same phrase again. The second time, the phrase was louder, as though the speaker had moved closer to the window near where Mr. Wakham was lying down. He consulted his wife, who could not confirm she had heard anything. Mr. Wakham lay back down when he heard a voice say, "Somebody help me, please." He picked up his telephone and looked out the window. Mr. Wakham testified that it was dark outside but that he could see a shadow and movement so he knew someone was outside his window. Mr. Wakham testified he shouted, "Hey!" and dialed 911 to report a woman crying for help. Mr. Wakham said he started to run outside, but his wife stopped him because he was not dressed. According to Mr. Wakham, he heard his "scanner" report that there had been another call in the same case. He testified that at one point, he looked out his peephole and he saw two people run by and heard one say, "Stop, you bastard." Mr. Wakham did not go out until he saw the police arrive. On cross-examination, Mr. Wakham testified that he got up and used the bathroom between the first and second time he heard the voice say "I just want to go home."

The victim was the State's final witness. She testified that she attended the party at Kristen Elder's apartment on the night of May 14, 2010. She was not acquainted with the defendant at the time. The victim testified she left the party with her cousin and his girlfriend. Her cousin and his girlfriend then brought her back to the party but did not stay. The victim testified that she had been drinking alcohol that night. The victim left the party to go to her car, and she remembered sitting in the driver's seat of her car, charging her cell phone.

The victim testified to a "gap" in her memory, during which she might have been sleeping or unconscious. This gap included the approach of a man who had a tattoo of numbers on his neck and whom the victim identified as the defendant. The victim testified that the defendant opened her car door and pulled her out of the car. She testified that he pulled her behind the apartment building and hit her on the side of her face, knocking her to the ground. She stated that he got on top of her and told her to take off her underwear; she refused and he hit her again and then she could feel him pull her underwear off. The victim testified that the defendant penetrated her and that as she struggled, he put his hand over her mouth and told her that if she was not quiet, he would kill her and her daughter. She testified that she was afraid, that she did not consent, and that she was telling the defendant to stop the entire time. She testified that she said she just wanted to go home and that she said, "Somebody help me." She did not know how loudly she was screaming, but it was loud enough for the defendant to hear her.

The victim testified that she was able to momentarily free herself, but in trying to escape, she ran into the side of the building, and that the defendant then had his hands around her neck. She testified that at that time, Mr. Thomas, Ms. Elder, and Ms. Elder's boyfriend came up and the defendant ran away. The victim went up to Ms. Elder's apartment, used the bathroom, and washed off her face; she did not recount the events to either her friends or the police because they did not ask her. The victim testified that she went to the hospital, where for the first time, she was asked what had happened. She testified that she told the hospital staff that the defendant had hit and raped her. The victim stated that she experienced vaginal pain, a swollen face, and abrasions as a result of the rape.

On cross-examination, the victim testified that she was sober when she arrived at the party, and then had two or three mixed drinks; she confirmed she had vomited but stated that it was because of something she ate. The victim testified that she had not passed out that night. She acknowledged that when she spoke with Investigator Jones, she did not tell her that she had been drinking. The victim testified that when she left the party with her cousin, they went for a drive; she denied that they were smoking or drinking. The victim testified that she left the party before the defendant; however, when shown her prior statement to law enforcement, she changed her testimony and stated that he left first. She testified she was

charging her phone and checking her text messages, and that she did not know why others thought she was passed out. The victim testified that when the defendant pulled her from her vehicle, she did not immediately scream for help but that she was telling him to stop the entire time. She testified she was hitting and kicking the defendant and screaming when he pulled her around the back of the building. She also stated that she bit the defendant's hand, but not hard enough to break the skin. The victim testified that she had told police he took a Kodak camera and forty dollars from her purse; she testified that she believed he took these items because they were not in her purse and her purse was beside the building. On redirect examination, the victim testified that she did not remember who had given her the mixed drinks or whether she got a drink from the defendant. She confirmed that she did not remember all the events of the night but stated that she remembered the defendant's face.

The jury found the defendant guilty of the lesser-included offense of attempted aggravated rape. The defendant appeals this conviction, contending that the evidence is insufficient to support the verdict.

**Analysis**

The defendant's challenges to the sufficiency of the evidence are based on (1) Nurse DeWitt's testimony and her report noting that the victim had no abrasions, bruises, or scrapes, and (2) the defendant's claim that there was "no medical, scientific or credible evidence" of attempted penetration.

An appellate court is required to set aside a criminal conviction when the evidence is insufficient to support a finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). In reviewing the sufficiency of the evidence, this Court does not, however, re-evaluate whether guilt was established beyond a reasonable doubt; instead, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). As questions regarding the credibility of witnesses, the weight and value to be given the evidence, and factual issues raised by the evidence have been resolved by the trier of fact, the reviewing court may not reweigh or reevaluate the evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The defendant's conviction removes the presumption of innocence and replaces it with one of guilt, and it becomes the defendant's burden to prove that the evidence is insufficient to support the verdict rendered. *State v. Carruthers*, 35 S.W.3d 516, 557-558 (Tenn. 2000).

Aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when accompanied by any of three enumerated circumstances, including that "[t]he defendant causes bodily injury to the victim." T.C.A. § 39-13-502(a). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(2). Criminal attempt requires that the perpetrator act with the culpability required for the underlying offense and may be committed in one of three ways, including that the perpetrator "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). Conduct constitutes a substantial step only when the "entire course of action is corroborative of the intent to commit the offense." T.C.A. § 39-12-101(b).

Although Nurse DeWitt testified that in her report, she indicated there were no abrasions, scrapes, or bruises on the victim, she also testified that the victim complained of lower back and vaginal pain and that it was possible the victim had minor abrasions which she had not noted. Moreover, five other witnesses – including the victim, Officer Ferguson, Ms. Elder, Mr. Rogers, and another medical professional, Nurse Phippen – testified regarding abrasions or scrapes sustained by the victim during the attack. The victim also testified to suffering pain and a swollen face. It is the jury's province to resolve conflicts in the evidence, and we conclude that the evidence was sufficient to prove bodily injury. *See State v. Samuel*, 243 S.W.3d 592, 605 (Tenn. Crim. App. 2007) (finding that a bruise and testimony that rape was painful and that defendant choked the victim constituted bodily injury); *State v. Locke*, 771 S.W.2d 132, 136 (Tenn. Crim. App. 1989) (finding that a scratch two and one-half inches long which did not bleed constituted bodily injury under prior statute).

The defendant argues that the jury did not credit the victim's testimony regarding a completed rape and that "the only evidence at trial concerning penetration, attempted or otherwise" came from the victim. The defendant ignores, however, the testimony of other witnesses that the defendant was pushing the victim against a wall in an isolated location, that the victim's dress had been pulled up, and that the victim's underwear had been removed, as well as the physical evidence of the victim's underwear, which was torn apart and muddy. Moreover, this is not a situation in which the victim's testimony provided evidence only of a completed and not of an attempted crime. *Cf. State v. Edwards*, No. E2010-01731-CCA-R3-CD, 2012 WL 1799025, at *10 (Tenn. Crim. App. May 18, 2012) (finding that "[t]he evidence at trial presented only two possible interpretations of the facts – that the defendant either completed the offense of aggravated sexual battery or he did not"). When a defendant is convicted of a lesser-included offense, the appellate court must find that

the evidence is sufficient to support each element of that offense, even if the proof at trial was sufficient to support the greater offense charged. *State v. Parker*, 350 S.W.3d 883, 909 (Tenn. 2011). Seen in the light most favorable to the State, the proof established that the defendant pulled the victim from her vehicle, that he forced her to a more isolated location as she called for help, that he pushed her to the ground so that her clothing and body became covered in dirt, that he was on top of her, that he told her to remove her underwear, and that he tore off her underwear when she refused to comply. Even if the jury did not credit the victim's testimony regarding a completed rape, the evidence was sufficient to support the conviction for attempted aggravated rape. *See State v. Elkins*, 102 S.W.3d 578, 585 (Tenn. 2003) (finding that physical contact in which defendant climbed on top of victim and started bouncing until interrupted by a third party was a substantial step towards attempted child rape).

## CONCLUSION

Based on the foregoing, we conclude that the evidence at trial was sufficient to support the defendant's conviction for attempted aggravated rape and affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE